PER CURIAM.
 

 John F. Mosley appeals his convictions for the first-degree murders of Lynda Wilkes and her infant son, Jay-Quan Mosley, and his sentence of death for the murder of Jay-Quan. We have jurisdiction.
 
 See
 
 art. V, § 3(b)(1), Fla. Const.
 

 Jay-Quan was born as a result of an extramarital affair between Mosley and Lynda Wilkes, and the State’s theory at trial was that the motive for the murder of mother and child was to avoid paying child support. For the reasons set forth in this opinion, we affirm the convictions and sentence of death.
 

 FACTS
 

 The Guilt Phase
 

 The murders of the two victims occurred on April 22, 2004, in Jacksonville, Florida. Although Mosley was married, he had a number of romantic relationships with other women in the Jacksonville area, including Lynda Wilkes. Because Wilkes was receiving Medicaid benefits for their son, Jay-Quan, she was required to participate in a proceeding to establish paternity. After Mosley failed to answer the petition to determine paternity, a default judgment was entered against him, and he was ordered to pay $35 a week in child support, with an additional $5 a week for retroactive child support. On March 12, 2004, Mosley filed a motion to have the final judgment set aside. A hearing on this motion was set for May 3, 2004.
 

 Around this time period, Mosley, who was thirty-nine, met Bernard Griffin, who was fifteen, and asked Griffin if he would be willing to kill a baby. During his attempts to convince Griffin to kill the child, Mosley pointed out Wilkes’s house and gave him a sketch of the house’s layout, but Griffin refused.
 

 On April 21, 2004, Mosley went to see Wilkes at her house in Jacksonville and asked Wilkes to meet him the next day at J.C. Penney so he could take Jay-Quan shopping. On April 22, 2004, Wilkes took her other children to school. That afternoon, she and Jay-Quan met Mosley at J.C. Penney, and together they left in Mosley’s vehicle, a burgundy Suburban. Mosley picked up Griffin, and eventually drove to a deserted dirt road in another part of Jacksonville. Mosley asked Wilkes to get out and pretended to look for something in the seat. He then turned and strangled Wilkes, who futilely attempted to defend herself. After she stopped moving, Mosley took a plastic shopping bag from the back of the vehicle, put it over Wilkes’s head, and put her body in the back of the Suburban. Mosley put a crying Jay-Quan in another garbage bag, tied it, and also placed it in the back of his vehicle. He used a blue tarp to cover Wilkes’s body and the bag with the baby in it. Initially, Griffin heard the baby crying, but after a while, the baby stopped. Mos
 
 *515
 
 ley dropped Griffin off and went to work.
 
 [1]
 

 Later that evening, while he was still at work, another of Mosley’s girlfriends, Já-mila Jones,
 
 [2]
 
 called and asked him for some gas money. He agreed that he would give her some money before she needed to leave for work the next day. That evening, Mosley clocked out of work at 11:01, and sometime after that picked up Griffin again in his Suburban. Griffin noticed that the vehicle smelled bad. Mosley drove out of Jacksonville towards Waldo, which was approximately sixty miles from Jacksonville. A few miles south of Waldo, Mosley turned and went down a number of dirt roads, eventually finding a suitable spot to dispose of Wilkes’s body. After Griffin refused to participate, Mosley pulled Wilkes to a clearing by himself, poured lighter fluid over her body, and then tossed a burning rag on her body. As the body began to burn, Mosley and Griffin ran to the vehicle and left. Mosley then drove approximately forty miles further south to Ocala and dumped the trash bag with the baby in a dumpster behind a Winn-Dixie store. He also threw his shoes and gloves into the dumpster. On the way back to Jacksonville, Mosley gave Griffin $100.
 

 Once they arrived in Jacksonville, it was daylight. After asking Griffin to give him back $20, Mosley stopped by Jones’s apartment at approximately six that morning and gave her $20. Jones asked Mosley why he did not answer his cell phone when she tried to call him the previous evening, and Mosley replied that he was “doing something for his mom.” Although Mosley was supposed to be back at work at six that same morning, he called in and said that he would be late because he did not get any sleep that night. He finally arrived at work at 12:49 p.m. on April 28.
 

 The victim’s family knew something was wrong when Wilkes failed to pick up her children from school on the afternoon of April 22. The family called the police, reported Wilkes as missing, and began a search for her and Jay-Quan immediately. During the evening hours of April 22, they found her ear abandoned at the J.C. Penney’s parking lot.
 

 On the morning after her disappearance (April 23), one of Wilkes’s daughters (Na-quita) and a family friend saw Mosley driving his vehicle and caught up to him while he was stopped at a traffic light. They told Mosley that Wilkes was missing. Initially, Mosley denied seeing her. After Naquita asked Mosley whether he failed to show up at J.C. Penney the previous day, Mosley admitted that he saw Wilkes the day before but claimed that he had dropped her off at her car. They asked Mosley if he could pull over, but he refused and drove away.
 

 On Saturday, April 24, Mosley changed all four tires on the Suburban, despite the fact that the tires could be driven for a few more thousand miles. Mosley was adamant that the mechanic load his old tires into his vehicle.
 

 During the investigation into Wilkes’s disappearance, the police attempted to contact Mosley numerous times, trying to arrange for an in-person interview. Mosley never met with any police officer until after he was taken into custody, but he did talk to numerous officers over the phone. He claimed that he and Wilkes met at the J.C. Penney’s parking lot on April 22 and left to see some nearby houses that Wilkes was considering renting. He further
 
 *516
 
 claimed that he dropped her off back at her car around one that afternoon.
 

 Days after the murder, after seeing news reports about the missing woman and baby, Griffin told his mother that he knew something about the case. He then talked to the police and eventually led police to the locations where Mosley killed Wilkes, where he burned her remains, and where he dumped the baby. Griffin was subsequently convicted of two counts of being an accessory after the fact for his involvement in the murders.
 

 Based on Griffin’s assistance, the police were able to recover Wilkes’s remains, which were badly burned. Wilkes’s watch, which was found with the burned body, stopped at 2:29.
 
 [3]
 
 Mosley’s cellular phone records established that at 2:24 a.m., on April 23, an outgoing call was made from Mosley’s cellular phone, and the cellular antenna used for this call was close to where Wilkes’s body was found. Despite a diligent search for the baby’s body, the baby’s body was never recovered.
 

 Wilkes’s DNA was found on a carpet sample from the Suburban. The medical examiner testified that after a person was strangled to death, the body could exude pinkish blood from the nose and mouth.
 

 After Mosley was arrested, he wrote Jones a letter, asking her to tell the police that he was alone when he came to her house on April 28 at 6:08 a.m. He also told her, “It is legal and okay to change your statement in court if you let the jury know the police pressured and coerced you to say something before they took the statement and during the statement.” Mosley also talked to his wife, Carolyn Mosley, asking her to “remember” that his mother stayed over that night and that he came home from work that night at 11:30. He told his wife that he needed her, their daughters, and his mother to write notarized statements that he arrived home that night at 11:30 and was there all night.
 

 During his defense at trial, Mosley presented evidence through his wife and daughters that he was at home the night that Griffin claimed they disposed of the bodies. Mosley’s doctor also testified that he was treating Mosley for some injuries sustained in a car accident. While the doctor discussed Mosley’s injuries in depth, he also admitted that the injuries would not have made it impossible for Mosley to lift a body. The jury ultimately found Mosley guilty of two counts of first-degree murder.
 

 The Penalty Phase
 

 In Mosley’s penalty phase, the State presented victim impact testimony from five witnesses and then rested, relying on the evidence from the guilt phase. Mosley presented the following testimony from his mother, Barbara McKinney: Mosley’s father physically abused Mosley and sexually abused Mosley’s sisters; Mosley’s step-grandfather murdered Mosley’s grandmother, with whom Mosley was close; Mosley got good grades, played football in high school, and was in the Boy Scouts; Mosley supported his family and children; he attended police academy, completed fire academy, received an emergency medical technician certification, was a volunteer fireman at different fire stations, volunteered as a coach for young children, and served on a tenant association; Mosley mentored a child; he joined the Navy after September 11, 2001; Mosley became a certified nursing assistant; Mosley was active in his children’s lives and was the vice president of the PTA; he brought his ninety-year-old aunt to family events so she did not have to spend holidays in a nursing home; and Mosley’s children were gifted, in part due to his hard work with them. A
 
 *517
 
 United States Navy Reserve recruiter testified that Mosley joined the Navy Reserve and entered at a higher rank due to his experience; he was an asset in boot camp and showed leadership skills; and he wanted to advance in the ranks and become a corpsman in the U.S. Marine Corps.
 
 [4]
 

 The jury recommended a life sentence for the murder of Lynda Wilkes and, by a vote of eight to four, recommended death for the murder of Jay-Quan Mosley. After the court held a separate
 
 Spencet
 

 [5]
 

 hearing, the trial court agreed with the jury’s recommendation and imposed a life sentence for the murder of Lynda Wilkes and a death sentence for the murder of Jay-Quan Mosley. In imposing the death sentence for the murder of Jay-Quan, the trial court found four aggravators, each of which was given great weight: (1) the victim of the capital felony was under twelve years of age; (2) the murder was cold, calculated, and premeditated (CCP); (3) the murder was committed for pecuniary gain; and (4) the defendant had been previously convicted of a capital felony (the contemporaneous murder of Wilkes). While the trial court did not find any statutory mitigators (and none were argued to apply), the trial court did find twenty-nine nonstatutory mitigating factors, most which were given little weight.
 
 [6]
 
 After weighing the aggravating and miti
 
 *518
 
 gating factors, the trial court found that “the weight of the aggravating circumstances far outweighs the weight of the mitigating circumstances and that death is the appropriate penalty.”
 

 ANALYSIS
 

 Mosley raised thirteen issues on appeal.
 
 [7]
 
 Through his counsel, Mosley withdrew two issues at oral argument (issue 5 and issue 9) because he conceded that neither issue was supported by the record.
 
 [8]
 
 We conclude that four of Mosley’s remaining claims are clearly without merit based on this Court’s precedent with respect to these issues and do not require further elaboration.
 
 [9]
 

 
 *519
 
 Prosecutor’s Remarks and Closing Argument
 

 Mosley first argues that several comments made by the prosecutor at various stages of the proceedings were improper. These comments fell into four categories: (1) comments inviting the jury to compare the worth of the victims’ lives to the worth of Mosley’s life; (2) comments that made Mosley’s other bad acts a feature of the trial; (3) “golden rule” comments asking the jurors to put themselves in the victims’ shoes; and (4) comments suggesting that the prosecutor’s office had prescreened the case and found that the death sentence was appropriate.
 
 [10]
 
 For the following reasons, we deny this claim.
 

 Aside from one objection to an alleged “golden rule” comment, defense counsel did not object to most of the statements that Mosley now contests. Accordingly, as this Court has held:
 

 [Fjailing to raise a contemporaneous objection when improper closing argument comments are made waives any claim concerning such comments for appellate review. The sole exception to the general rule is where the unobjected-to comments rise to the level of fundamental error, which has been defined as error that “reaches down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error.”
 

 Simpson v. State,
 
 3 So.3d 1135, 1146 (Fla.2009) (quoting
 
 Brooks v. State,
 
 762 So.2d 879, 898-99 (Fla.2000)),
 
 petition for cert. filed,
 
 No. 08-10414 (U.S. May 11, 2009). None of the unobjected-to comments that Mosley points to, whether considered individually or collectively, rise to the level of fundamental error. Additionally, while Mosley did object to one closing argument, we find that this comment does not merit reversal when considered both individually and cumulatively with any other allegedly improper comment.
 

 In the first category of allegedly improper statements which we address, Mosley claims that the prosecutor asked the jurors to weigh the comparative value of Mosley’s life versus the victims’ lives. We have reviewed the comments alleged to be improper and conclude that none of the comments compared the victims’ lives to Mosley’s life or invited the jury to place a value on the victims’ lives. Therefore, there is no error, much less fundamental error, as to this subissue.
 

 In the next category of alleged errors, Mosley claims that the prosecutor improperly made his prior bad acts a feature of the case. In this regard, he points to the prosecutor’s comments about the defendant “driving around with other people’s driver’s licenses in his car” and comments about the defendant’s extramarital affairs when the prosecutor stated in closing argument that Mosley had “girlfriends all over the place.”
 

 
 *520
 
 This claim must also fail because no improper arguments were made. In fact, it was Mosley’s counsel who referenced this evidence first by informing the jury in opening statement that Mosley was having three extramarital affairs as follows:
 

 [Y]es, he was having an affair, but not just one, more than one affair. He was having an affair with Lynda Wilkes. He was having an affair with Alesha Jackson and he was having an affair with Jamila Jones, unfortunately all while he was married, and that’s why we talked about it because those things don’t make him a murderer.
 

 The prosecutor during closing statements briefly referred to this same evidence, disputing Mosley’s claim that he was leading a normal life at the time of the crime because he had “girlfriends all over the place.” Likewise, with regard to the driver’s license, Mosley attempted to show that the person whose driver’s license was found in Mosley’s vehicle might have been the actual perpetrator of the crime. That theme was part of the defense argument made in closing that the police never followed up on this other possible suspect whose driver’s license was found in the vehicle. This argument gave rise to the State’s rebuttal argument that the police investigated this driver’s license but that person had nothing to do with the case and this just showed that Mosley was “driving around with other people’s licenses in his car.” Clearly, the State acted within permissible bounds as to both arguments.
 
 See, e.g., Walls v. State,
 
 926 So.2d 1156, 1166 (Fla.2006) (“A prosecutor’s comments are not improper where they fall into the category of an ‘invited response’ by the preceding argument of defense counsel concerning the same subject.”).
 

 In the third category of allegedly improper comments, Mosley claims that the prosecutor advanced an improper “golden rule” argument at trial. “Golden rule” arguments are arguments that invite the jurors to place themselves in the victim’s position during the crime and imagine the victim’s suffering.
 
 See, e.g., Merck v. State,
 
 975 So.2d 1054, 1062 (Fla.2007) (defining “golden rule” arguments),
 
 cert. denied,
 
 - U.S. -, 129 S.Ct. 78, 172 L.Ed.2d 66 (2008);
 
 Pagan v. State,
 
 880 So.2d 792, 812-13 (Fla.2002) (same). This Court has repeatedly held that “golden rule” arguments are improper.
 
 Bailey v. State,
 
 998 So.2d 545, 555 (Fla.2008) (“This Court has long prohibited golden rule arguments .... ”). Mosley points to two comments in this category that he claims constituted “golden rule” arguments:
 

 PROSECUTOR: Maybe [Lynda Wilkes] wondered why they were picking up this young boy but they picked him up and began driving, and they got out to that wooded area and she must have wondered why. She must have wondered then what are we doing here, but the defendant stops the car and he’s looking for something in the car. Maybe she was excited about that. She steps out of the car and then the defendant grabbed her and strangled her. And her last moments must have been—
 

 DEFENSE COUNSEL: I object, Your Honor, improper argument.
 

 THE COURT: Well, go ahead, Mrs. Senterfitt. Try to stick to the facts.
 

 PROSECUTOR: She blacked out. Didn’t take long. With the pressure around her throat she would have blacked out in darkness and then Jay-Quan Mosley is crying and then darkness. He’s in a bag and he’s trying to breathe but the bag gets closer and closer to his face.
 

 DEFENSE COUNSEL: Your Honor, I object. It is actually—
 

 PROSECUTOR: Your Honor, that is absolutely testimony in this case.
 

 
 *521
 
 DEFENSE COUNSEL: It’s improper argument, your Honor. I need a sidebar.
 

 THE COURT: It is in the evidence, Mr. Kuritz. The objection is overruled.
 

 PROSECUTOR: Dr. Arruza [the medical examiner] described how the bag got closer and closer but mercifully not long, not long for Jay-Quan. Then, ladies and gentlemen, they’re in the back of the car and Lynda Wilkes’ head was up at the back of that car and seeping blood.
 

 As noted in the quoted text above, defense counsel contemporaneously objected to this argument by the prosecutor.
 

 The second comment that Mosley alleges was improper came when the prosecutor argued during closing arguments as follows:
 

 From the testimony of the Medical Examiner, [Lynda Wilkes] did not go unconscious right away. Lynda Wilkes was on the ground, looking up at that man, that face, someone she trusted, knowing that she wasn’t leaving Arms-dale [the killing site]. She had the opportunity to contemplate her own death and he went on as the Medical Examiner told you approximately four minutes to kill someone by strangulation, much less to render them unconscious, but to kill them a tremendous amount of time and force and constant pressure and constant intent.
 

 No objection was made to this second comment and accordingly any impropriety must be analyzed under the fundamental error standard.
 
 See Brooks,
 
 762 So.2d at 898.
 

 As to the first prosecutorial comments, while the trial court did not sustain the defendant’s objection, the trial court told the prosecutor to “try to stick to the facts.” The prosecutor never elaborated on what the victims’ last moments must have been. Instead, the first comments were directly relevant to the circumstances of the murder and Mosley’s plan to lure Wilkes on the pretense of taking her to buy clothes for their son. While the momentary comments that “maybe she was excited about that” may appear to be speculative in isolation, taken in context they were permissible argument based on the facts of this case. As to the second set of comments, those comments were directly relevant to the HAC aggravator and had a factual basis in the testimony of both Griffin and the medical examiner.
 

 A prosecutor may make comments describing the murder where these comments are based on evidence introduced at trial and are relevant to the circumstances of the murder or relevant aggravators, so long as the prosecutor does not cross the line by inviting the jurors to place themselves in the position of the victim.
 
 See, e.g., Bailey,
 
 998 So.2d at 555 (holding comments that encouraged jurors to visualize the actual distance between the gun and the victim, based on evidence in the record, were not improper);
 
 Rogers v. State,
 
 957 So.2d 538, 549 (Fla.2007) (holding, in the context of an ineffective assistance of counsel claim, that prosecutorial comments about the victim’s murder and her last moments alive were “not improper because they were based upon facts in evidence” and concluding that the comments were not “golden rule” arguments).
 

 We therefore conclude that the arguments actually made to the jury were not golden rule arguments or improper “imaginary scripts” where a prosecutor speculates as to a victim’s final moments.
 
 Cf. Urbin v. State,
 
 714 So.2d 411, 421 (Fla.1998) (determining that the prosecutor had engaged in a “subtle ‘golden rule’ argument” by creating an imaginary script demonstrating that the victim was shot
 
 *522
 
 while pleading for his life). Accordingly, we deny relief on this claim.
 

 As for the final subclaim on this issue, which we categorize as prescreening comments, we have condemned comments where the prosecutor states that the death penalty is sought only after the State Attorney’s Office determines that the particular case warrants the imposition of the death penalty. In
 
 Brooks,
 
 762 So.2d at 901, the prosecutor argued during closing, “I would submit now that the State does not seek the death penalty in all first-degree murders because it’s not always proper, not always appropriate.” The prosecutor then described a hypothetical murder in which the State would not seek the death penalty. The defense objected to this line of argument, but the trial court overruled the objection. In
 
 Brooks,
 
 we found these comments were improper and explained that while “prosecutor[s] ... [are] undoubtedly correct in stating that the State does not seek the death penalty in all first-degree murder cases,” nevertheless this “true statement ... is also irrelevant and tends to cloak the State’s case with legitimacy as a bona-fide death penalty prosecution, much like an improper ‘vouching’ argument.”
 
 Brooks,
 
 762 So.2d at 902.
 

 In this case, the prosecutor commented during voir dire as follows:
 

 We need people who can come to this courtroom with an open mind despite their preconceived notions or experiences and follow the Court’s instruction with regard to the death penalty, so I’m going to ask questions in that vein with the understanding again as Judge Weatherby mentioned there’s only two possible penalties if the defendant is found guilty of first degree murder, the death penalty or life imprisonment without the possibility of parole.
 

 First of all does everyone understand that the death penalty is not sought in every first degree murder case?
 

 (Emphasis added.) Immediately after this question, to which one prospective juror answered affirmatively, the prosecutor and prospective jurors discussed whether the jurors were for or against the death penalty and whether the death penalty automatically applied or whether there was a weighing process to determine when it applied. The second comment occurred during the penalty phase closing arguments:
 

 As His Honor told you and we have told you death is not appropriate and
 
 it’s not sought in every first degree murder case but it is sought in this one,
 
 and his Honor again will go over with you aggravating circumstances and mitigation and he will tell you it’s not a counting process. It’s not, “does the state have more aggravators or does the defense have more mitigators?” It’s a qualitative process, what is heavier, what means more. That’s how you decide, and as we talked about this morning you will render a recommendation for each of these murders, one for Lynda Wilkes and one for Jay-Quan.
 

 (Emphasis added.) These comments come close to our prohibition against prescreen-ing comments as to the selection process for first-degree murder cases condemned in
 
 Brooks.
 

 While we caution prosecutors to heed our admonition in
 
 Brooks,
 
 in assessing the potential impact of these comments in this case for a fundamental error analysis, we note that both comments were relatively brief and were primarily made to inform the voir dire panel and the penalty phase jury, respectively, of the process for weighing the aggravating and mitigating factors in the penalty phase. Further, the trial court properly instructed the jury on its weighing functions. Moreover, as the
 
 *523
 
 State pointed out during oral argument, in this case the jury in fact performed its weighing function because it recommended death only for the murder of Jay-Quan and recommended life for the murder of Lynda Wilkes.
 

 The situation currently before this Court is distinguishable from
 
 Brooks.
 
 Here, these were the only improper arguments. In reviewing these comments in their entirety, we hold that neither comment rises to the level of fundamental error. The comments did not “reach[ ] down into the validity of the trial itself to the extent that a verdict of guilty or jury recommendation of death could not have been obtained without the assistance of the alleged error,” as the standard for fundamental error requires.
 
 Poole v. State,
 
 997 So.2d 382, 390 (Fla.2008). Having analyzed each category of alleged impermissible argument and having considered those arguments, individually and collectively, we reject Mosley’s claim of error.
 

 Admissibility of Recorded Husband-Wife Jail Conversations
 

 In this claim, Mosley attacks the admissibility of a recorded collect call between Mosley and his wife as a violation of the spousal privilege. In the initial portion of the call, the telephone company requested authorization for the collect call, and then stated that “this call is subject to monitoring and recording.” As soon as the call began, Mosley immediately told his wife that she should remember April 22, when he came home right after work around 11:30 p.m. He also asked that she remember that his mother stayed over at the house that night because she had been working and wanted to get in early the next day since her job was around the corner. He further asked Mrs. Mosley to get notarized statements from his mother and his daughters to say that he was home all night on April 22.
 

 Section 90.504, Florida Statutes (2008), provides for the spousal privilege:
 

 (1) A spouse has a privilege during and after the marital relationship to refuse to disclose, and to prevent another from disclosing, communications which were intended to be made in confidence between the spouses while they were husband and wife.
 

 (2) The privilege may be claimed by either spouse or by the guardian or conservator of a spouse. The authority of a spouse, or guardian or conservator of a spouse, to claim the privilege is presumed in the absence of contrary evidence.
 

 (3) There is no privilege under this section:
 

 (a) In a proceeding brought by or on behalf of one spouse against the other spouse.
 

 (b) In a criminal proceeding in which one spouse is charged with a crime committed at any time against the person or property of the other spouse, or the person or property of a child of either.
 

 (c) In a criminal proceeding in which the communication is offered in evidence by a defendant-spouse who is one of the spouses between whom the communication was made.
 

 § 90.504, Fla. Stat. (2008). This privilege can be waived by voluntary disclosure:
 

 A person who has a privilege against the disclosure of a confidential matter or communication waives the privilege if the person, or the person’s predecessor while holder of the privilege, voluntarily discloses or makes the communication
 
 when he or she does not have a reasonable expectation of privacy,
 
 or consents to disclosure of, any significant part of the matter or communication. This section is not applicable when the disclosure is itself a privileged communication.
 

 
 *524
 
 § 90.507, Fla. Stat. (2008) (emphasis supplied).
 

 We initially reject the State’s argument that Mosley waived any claim of error by calling Mrs. Mosley to the stand and asking about the substance of the conversation. Mosley raised this issue by motion in limine, and the trial court ruled that the conversation was admissible. Therefore, the presentation of the evidence did not constitute invited error.
 
 See Sheffield v. Superior Ins. Co.,
 
 800 So.2d 197, 202 (Fla.2001) (holding that the concept of “ ‘invited error’ does not apply where, as here, the trial court makes an unequivocal ruling admitting evidence over the mov-ant’s motion in limine, and the movant subsequently introduces the evidence in an attempt to minimize the prejudicial impact of the evidence”);
 
 Rodgers v. State,
 
 948 So.2d 655, 666 (Fla.2006) (relying on
 
 Sheffield
 
 to hold the defendant preserved his claim despite submitting the evidence himself).
 

 On the merits, however, we agree with the trial court and the State that Mosley waived any privilege because he did not have a “reasonable expectation of privacy” when he and his wife talked on the telephone. The call began with a prerecorded warning that “this call is subject to monitoring and recording.” Besides this clear message, Mosley was given a handbook which explicitly warned that telephone calls made in jail would be monitored.
 
 [11]
 
 Accordingly, we deny this claim.
 

 Denial of Motion for Continuance
 

 Mosley asserts that the trial court erred in denying his motion for continuance when the defense could not locate and present two potential defense witnesses. One witness, Billy Powell, was subpoenaed but did not appear. Powell was Griffin’s probation officer for an unrelated charge; Griffin was sentenced to probation the day before Wilkes disappeared. Griffin’s juvenile record, which was disclosed during trial, showed that during a conference Griffin stated he did not have cocaine and that he took responsibility for the charge so that his cousin would not get into trouble.
 
 [12]
 
 Defense counsel asserted that he should be able to call Powell and question him about this because “it goes to the theory of the defense for impeachment of a critical state witness who indicated already in proffer that he denies making that statement.”
 

 After the trial ended, counsel asserted that Mosley requested a continuance because defense counsel was unable to locate a second witness, Wanda Swearingen, who was Wilkes’s neighbor and who, Mosley said, would have testified that she saw Jay-Quan on the afternoon of the disappearance with a different man. The trial court denied the motions for continuance as to both of these witnesses and denied the related motions for mistrial. In a hearing which occurred after both sides rested, the State disputed Swearingen’s potential testimony. The State clarified that Swearingen was mentioned in one of
 
 *525
 
 Detective Romano’s supplemental reports and, according to that report, Swearingen told the police that she lived next door to Lynda Wilkes’s oldest daughter and she thought that she saw Mosley on April 22 at 2:45 p.m. at a Winn-Dixie store with a baby.
 
 [13]
 
 The State presented undisputed evidence that Mosley was at work that day from approximately 2:31 p.m. until 11:01 p.m. Since Swearingen’s potential testimony would have concerned a time that Mosley was at work, the State argued that her testimony would not have been helpful.
 

 To prevail on a motion for continuance based on the absence of a witness, the defendant must show: (1) prior due diligence to obtain the witness’s presence; (2) substantially favorable testimony would have been forthcoming; (8) the witness was available and willing to testify; and (4) the denial of the continuance caused material prejudice.
 
 Geralds v. State,
 
 674 So.2d 96, 99 (Fla.1996);
 
 see also Holmes v. State,
 
 992 So.2d 828, 328 (Fla. 3d DCA 2008);
 
 Watson v. State,
 
 989 So.2d 699, 700 (Fla. 4th DCA 2008). A trial judge’s ruling on a motion for a continuance will be disturbed only if there has been an abuse of discretion.
 
 Israel v. State,
 
 837 So.2d 381, 388 (Fla.2002). Likewise, this Court reviews a trial court’s ruling on a motion for mistrial under an abuse of discretion standard.
 
 Salazar v. State,
 
 991 So.2d 364, 371 (Fla.2008). Such a motion should be granted “only when it is necessary to ensure that the defendant receives a fair trial.”
 
 Id.
 
 at 372 (quoting
 
 Cole v. State,
 
 701 So.2d 845, 853 (Fla. 1997)). The trial court did not abuse its discretion in denying the motion for continuance and the related motion for mistrial.
 

 As to Powell, assuming that Mosley can show due diligence, he did not demonstrate the witness’s availability to testify or that Powell could have provided substantially favorable testimony. In requesting the motion for continuance, Mosley informed the court that Powell had apparently moved out of state and he had no information as to Powell’s location. More importantly, it is questionable whether Powell’s testimony would have been admissible, since it would have rebutted a statement that was made only during a proffer and would have constituted impeachment on a collateral matter.
 
 See, e.g., Caruso v. State,
 
 645 So.2d 389, 394 (Fla.1994) (“It is well established that if a witness is cross-examined concerning a collateral or irrelevant matter, the cross-examiner must ‘take’ the answer, is bound by it, and may not subsequently impeach the witness by introducing extrinsic evidence to contradict the witness on that point.”).
 

 As to Swearingen, Mosley cannot show due diligence in attempting to obtain this witness’s presence. Before the defense rested, the court explicitly asked Mosley whether he wanted his counsel to call any other witnesses that had not yet been called. Mosley replied that there were none and that his counsel had diligently tried to find all of the witnesses. The defense then rested, and the State finished its rebuttal and rested. The next day, Mosley requested a continuance, asserting that this was necessary to present Swear-ingen’s testimony. However, he provided no explanation for his failure to raise this issue with the court earlier. In addition, Mosley did not show that Swearingen was available or had potentially favorable testimony. As the State pointed out, Swearin-gen would have placed Mosley in another location during a time when it was established that he was at work. Because Mosley cannot demonstrate compliance with the
 
 Geralds
 
 factors, we hold that the trial
 
 *526
 
 court did not abuse its discretion in denying a motion for continuance.
 

 Double Murder as Support for the Prior Violent Felony Aggravator
 

 Mosley argues that the trial court effectively held that a double homicide automatically establishes the prior violent felony aggravator. This Court has consistently and repeatedly held that a contemporaneous conviction of a violent felony can be a basis for the prior violent felony aggravator.
 
 See, e.g., Bevel v. State,
 
 983 So.2d 505, 517 (Fla.2008) (“This Court has repeatedly held that Vhere a defendant is convicted of multiple murders, arising from the same criminal episode, the contemporaneous conviction as to one victim may support the finding of the prior violent felony aggravator as to the murder of another victim.’ ”) (quoting
 
 Francis v. State,
 
 808 So.2d 110, 186 (Fla.2001));
 
 Buzia v. State,
 
 926 So.2d 1203, 1209 (Fla.2006) (“[W]e have long recognized that a contemporaneous conviction for a violent felony can serve as a basis for the prior violent felony aggravator.”). Accordingly, we deny this claim.
 

 Motion for Judgment of Acquittal
 

 In his next claim, Mosley asserts that the trial court erred in denying his motion for judgment of acquittal because the case was circumstantial and Mosley had a reasonable hypothesis of innocence that was not overcome, particularly in light of the evidence establishing that he had an alibi for the crimes. In
 
 Pagan v. State,
 
 830 So.2d 792, 803 (Fla.2002), this Court set forth the appropriate standard of review when reviewing a motion for judgment of acquittal:
 

 In reviewing a motion for judgment of acquittal, a de novo standard of review applies.
 
 See Tibbs v. State,
 
 397 So.2d 1120 (Fla.1981). Generally, an appellate court will not reverse a conviction which is supported by competent, substantial evidence.
 
 See Donaldson v. State,
 
 722 So.2d 177 (Fla.1998);
 
 Terry v. State,
 
 668 So.2d 954, 964 (Fla.1996). If, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt, sufficient evidence exists to sustain a conviction.
 
 See Banks v. State,
 
 732 So.2d 1065 (Fla.1999). However, if the State’s evidence is wholly circumstantial, not only must there be sufficient evidence establishing each element of the offense, but the evidence must also exclude the defendant’s reasonable hypothesis of innocence.
 
 See Orme v. State,
 
 677 So.2d 258 (Fla.1996).
 

 If the State presents both direct and circumstantial evidence, courts do not apply the special standard of review applicable to circumstantial evidence cases.
 
 Pagan,
 
 830 So.2d at 803.
 
 [14]
 
 A motion for judgment of acquittal should not be granted unless “there is no view of the evidence which the jury might take favorable to the opposite party that can be sustained under the law.”
 
 Williams v. State,
 
 967 So.2d 735, 755 (Fla.2007) (quoting
 
 Gudinas v. State,
 
 693 So.2d 953, 962 (Fla.1997)).
 

 In this case, the State presented both direct and circumstantial evidence as to the murders. Griffin provided direct evidence that he observed Mosley kill Wilkes
 
 *527
 
 and put her body in the back of his Suburban. He further testified that he saw Mosley put Jay-Quan in a garbage bag, tie the bag up, and place it in the back of the vehicle. Griffin heard the baby cry for a short time, but then the baby stopped. The medical examiner testified that if a baby is placed in a plastic bag and the bag is tied closed, the baby will die very quickly, both by asphyxia and exclusion of air. Griffin was with Mosley when Mosley disposed of the bodies and was able to help the police locate Wilkes’s remains. A watch found with the remains stopped at 2:29. The State also introduced evidence which established that at 2:24 a.m. on April 23, Mosley’s cell phone utilized a cell tower that was near Wilkes’s remains. This evidence corroborated Griffin’s testimony that Mosley was in the vicinity that evening. In addition, Wilkes’s DNA was found on carpet in Mosley’s Suburban.
 

 Although Mosley claims to have an alibi for his whereabouts at the time of his crimes and when the bodies were disposed of, this conflicting evidence was a matter for the trier of fact to weigh and determine. In fact, while his wife and children asserted that he was at home during the early morning hours of April 23, this conflicts with Mosley’s own written statements to Jamila Jones where he admitted that he was at her house at 6:08 that morning and asked her to testify that he came alone. The State introduced competent, substantial evidence from which a rational finder of fact could find that Mosley was guilty beyond a reasonable doubt of two counts of first-degree murder. Thus, the trial court did not err in denying the motion for judgment of acquittal.
 

 Motion for New Trial
 

 In his eighth claim, Mosley alleges that the trial court erred in denying his motion for new trial because the guilty verdict was contrary to the weight of the evidence. While counsel filed a motion for new trial asserting numerous grounds, as to this specific claim, counsel alleged only, “The verdict is contrary to the weight of the evidence.” In
 
 Stephens v. State,
 
 787 So.2d 747, 754 (Fla.2001), we held that where defense counsel made a bare-bones motion for a new trial, counsel did not properly preserve the issue for appeal.
 

 On the merits, there was no basis to grant a new trial. As discussed above, Griffin provided eyewitness testimony that he witnessed Mosley kill Wilkes and saw him burn her body. Griffin also saw Mosley place the baby in a trash bag, and heard the baby stop crying shortly after that. Expert testimony established that an infant would die quickly if he was trapped in a trash bag. While Mosley questions the reliability of Griffin’s testimony and points out that the baby’s body was never found, this does not show that the court abused its discretion. As addressed above, there was competent, substantial evidence supporting both convictions. Accordingly, we deny the claim that the trial court erred in denying the motion for new trial.
 

 Proportionality
 

 In the final claim that we address in detail, Mosley alleges that his sentence of death is disproportionate. The death penalty is reserved for “only the most aggravated and least mitigated of first-degree murders.”
 
 Lebron v. State,
 
 982 So.2d 649, 668 (Fla.2008) (quoting
 
 Urbin,
 
 714 So.2d at 416). “In conducting its proportionality review, this Court must compare the totality of the circumstances in a particular case with other capital cases to determine whether death is warranted in the instant case.”
 
 Rimmer v. State,
 
 825 So.2d 304, 331 (Fla.2002). This entails “a qualitative review by this Court of the underlying basis for each aggravator and
 
 *528
 
 mitigator rather than a quantitative analysis.”
 
 Urbin,
 
 714 So.2d at 416.
 

 In this case, the trial court found the following four aggravators: (1) the victim was under twelve years of age; (2) the murder was CCP; (3) the murder was committed for pecuniary gain; and (4) the defendant had been previously convicted of a capital felony. The trial court did not find any statutory mitigators, but found and considered twenty-nine nonstatutory mitigating factors, none of which were particularly weighty. The trial court concluded that “the weight of the aggravating circumstances far outweighs the weight of the mitigating circumstances” and sentenced Mosley to death for the murder of Jay-Quan.
 

 Mosley does not challenge the trial court’s findings, but focuses on whether this is the most aggravated and least mitigated of cases, relying on the mitigation found by the trial court. In claiming that his death sentence is not proportionate, Mosley relies upon
 
 Johnson v. State,
 
 720 So.2d 232 (Fla.1998).
 
 Johnson
 
 is distinguishable. In
 
 Johnson,
 
 two individuals robbed a family that they claimed owed them a debt, and the defendant shot the victim after the victim allegedly pulled a gun on him.
 
 Johnson,
 
 720 So.2d at 234-35. The trial court in
 
 Johnson
 
 found only two aggravators: (1) the murder was committed during a burglary and for pecuniary gain (merged); and (2) the defendant had prior violent felony convictions.
 
 Id.
 
 at 235. The court found one statutory miti-gator (the defendant was twenty-two years old) and six nonstatutory mitigators, including that he surrendered to the police, had a troubled childhood, was previously employed, was a good son and neighbor, had a young child, earned a high school graduate equivalency degree, and participated in high school athletics. After undertaking a qualitative review of the ag-gravators, this Court held that the prior violent felony aggravator was not as strong when the underlying facts of those prior convictions were considered.
 
 Id.
 
 at 238. The Court then weighed the two aggravators (one which was not particularly weighty) against the statutory and non-statutory mitigation and held that the death sentence in
 
 Johnson
 
 was disproportionate.
 
 Id.
 

 In this case, however, four aggravators were found, including the two aggravators found in
 
 Johnson,
 
 as well as CCP and that the victim was younger than twelve. Further, the prior violent felony aggravator in this case is significantly weightier since this aggravator was based on the contemporaneous murder of Mosley’s former girlfriend and the mother of his child. While numerically there were more nonstatutory mitigators in this case than in
 
 Johnson,
 
 the trial court here gave none of that mitigation significant weight whereas the court in
 
 Johnson
 
 accorded one mitigator substantial weight and found one statutory mitigator. Moreover, as we stated previously, proportionality review does not entail a quantitative review but a qualitative review.
 

 We find that this case is more comparable to
 
 Lynch v. State,
 
 841 So.2d 362 (Fla.2003). In
 
 Lynch,
 
 the defendant had a long affair with one of the victims and was attempting to have her pay a credit card debt. He arrived at the victim’s house, held her thirteen-year-old daughter hostage at gunpoint until the victim arrived, and then shot both the victim and her daughter. The trial court found three aggravating factors as to the murder of the mother (CCP; a prior violent felony conviction; and commission while the defendant was engaged in committing other felonies) and three aggravators as to the murder of the daughter (heinous, atrocious, or cruel; a prior violent felony
 
 *529
 
 conviction; and commission while the defendant was engaged in committing other felonies).
 
 See id.
 
 at 368. The court also found one statutory mitigator (no significant history of prior criminal activity) and eight nonstatutory mitigators as to each murder, including that the crime was committed while defendant was under the influence of a mental or emotional disturbance and the defendant’s capacity to conform his conduct to the requirements of law was impaired.
 
 See id.
 
 at 368 n. 5. After comparing
 
 Lynch
 
 with other cases decided by the Court, as well as reviewing the trial court’s findings, the Court held that the death penalty was proportional.
 
 See id.
 
 at 378.
 

 Here, Mosley coldly and carefully planned how to kill his girlfriend and the baby born out of their relationship in order to avoid child support payments. He created a ruse by promising to take Wilkes and Jay-Quan shopping for supplies for the child. After he picked them up, he drove them to an isolated dirt road, told Wilkes to step out of the car, and then strangled her to death. After she was dead, he placed the helpless baby in a trash bag and let him suffocate to death. Later that night, he and Griffin took Wilkes’s body out of town and burned it, and he threw the trash bag with Jay-Quan’s body in a dumpster. After comparing the totality of the circumstances in this case with other capital cases, including a qualitative review as to the underlying basis for each aggravator and mitigator, we find that Mosley’s death sentence is proportionate.
 
 See also Carter v. State,
 
 980 So.2d 473 (Fla.) (holding that death sentence was proportional after defendant killed his former fiancé, her new boyfriend, and his former fiancé’s daughter in a case that involved three aggravators (prior violent felony conviction; commission in the course of burglary; and CCP) and seventeen nonstatutory mitigators),
 
 cert, denied,
 
 — U.S. -, 129 S.Ct. 400, 172 L.Ed.2d 292 (2008);
 
 Dennis v. State,
 
 817 So.2d 741 (Fla.2002) (holding death sentence was proportional for double murder of mother of defendant’s child and the mother’s date in a case involving four ag-gravators (prior violent felony conviction; commission during a burglary; HAC; and CCP), one statutory mitigator, and two nonstatutory mitigators).
 

 CONCLUSION
 

 For the foregoing reasons, we affirm Mosley’s convictions for first-degree murder and his death sentence for the murder of his infant son, Jay-Quan Mosley.
 

 It is so ordered.
 

 QUINCE, C.J., and PARIENTE, LEWIS, CANADY, POLSTON, and LABARGA, JJ., concur.
 

 PERRY, J., did not participate.
 

 [1]
 

 . At the time of the crime, Mosley worked at a convenience store.
 

 [2]
 

 . Jones knew Mosley as Jay and thought he lived alone.
 

 [3]
 

 . There is no indication in the record whether this was a.m. or p.m.
 

 [4]
 

 . Mosley chose not to present additional witnesses, and the court found that Mosley was competent to make this decision. Mosley does not challenge this decision on appeal.
 

 [5]
 

 .
 
 Spencer v. State,
 
 615 So.2d 688 (Fla.1993). Mosley called two additional witnesses during the
 
 Spencer
 
 hearing: a neighbor who knew Mosley growing up and Mosley's wife, who provided similar testimony as Mosley’s mother.
 

 [6]
 

 . The trial court found the following miti-gators: (1) Mosley was raised in a broken home (little weight); (2) Mosley was an above-average high school student (little weight); (3) Mosley was affected by seeing physical and sexual abuse at an early age (little weight); (4) Mosley has the love and support of family members (some weight); (5) Mosley was a good parent (little to no weight); (6) Mosley was a good and respectful son to his mother, grandmother, and other family members (some weight); (7) Mosley was a good friend to many (some weight); (8) Mosley has shown no homicidal behavior and committed no violent acts since his arrest (little weight); (9) Mosley has the potential to be a productive inmate (some weight); (10) Mosley was a good worker and maintained steady employment throughout his adult life (some weight); (11) Mosley was a patriotic citizen (little weight); (12) Mosley was never disciplined or reprimanded for his performance of his duties while in the Navy Reserve (little weight); (13) Mosley completed an extended program to receive an emergency medical care certificate (some weight); (14) Mosley was a volunteer recreational coordinator for a tenant advisory council (little weight); (15) Mosley completed an extensive program to receive a diploma certificate from the Division of State Fire Marshal for the volunteer basic course (some weight); (16) Mosley successfully completed the certified nursing assistant program from the Department of Health (some weight); (17) Mosley mentored numerous teenagers and helped them with school and other activities (little weight); (18) Mosley is intelligent (little to no weight); (19) the murders were an aberrant act for Mosley that did not fit his life history (little to no weight); (20) Mosley was mentally abused as a child (little weight); (21) Mosley was a Boy Scout in his early years (little weight); (22) Mosley completed law enforcement training (some weight); (23) Mosley coached neighborhood youths in sports and recreation (little weight); (24) Mosley was an active volunteer fireman at two local stations (some weight); (25) Mosley was an active member of the PTA (little weight); (26) the offense and all aggravating factors occurred in an extremely short period of time (little to no weight);(27) Mosley encouraged others to remain in school and complete their education (little weight); (28) Mosley demonstrated appropriate courtroom behavior (little weight); and (29) the State’s and the trial court's treatment of Bernard Griffin was mitigating in nature (little weight). As to the last
 
 *518
 
 mitigator involving Griffin, the trial court found nothing in the record to suggest that the manner in which the State treated Griffin should mitigate or reduce the sentence imposed against Mosley, particularly since the court found the evidence “quite clear that Bernard Griffin became involved only because the defendant took advantage of a young teenager ... and turned that teenager into the defendant's assistant.”
 

 [7]
 

 .Mosley raised the following claims on appeal: (1) the due process clause of the Florida Constitution provides more protection to criminal defendants than the United States Constitution: (2) the prosecutor made improper and inflammatory remarks that deprived Mosley of a fair trial; (3) the trial court erred in admitting the recorded husband-wife jail conversations; (4) the trial court erred in denying Mosley's motion for a continuance and for a mistrial based on a defense witness who failed to appear at trial; (5) the trial court erred in including a videotape of the defendant in shackles and jail garb among the materials delivered to the jury room; (6) the trial court erred in effectively ruling that a double murder automatically suffices as the "previously convicted of another capital felony" aggravating circumstance; (7) the trial court erred in denying Mosley’s motion for judgment of acquittal; (8) the trial court erred in denying Mosley's motion for a new trial because the guilty verdict was contrary to the weight of the evidence; (9) the trial court erred in denying Mosley’s request for the standard jury instruction which concerns pressure or threat against a witness; (10) Florida’s death penalty scheme violates the Sixth Amendment and
 
 Ring v. Arizona,
 
 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); (11) this Court's comparative proportionality review of death sentences is unconstitutional; (12) Mosley’s sentence of death is disproportionate; and (13) lethal injection and Florida’s lethal injection procedures are unconstitutional.
 

 [8]
 

 . We always encourage parties to make concessions on appeal when appropriate. However, in this case, although the record affirmatively contradicted two of the defendant’s positions on appeal, appellate counsel Ryan Truskoski waited until oral argument to announce that he was withdrawing these arguments. Certainly, by the time of the State's answer brief, counsel would have known that the record affirmatively refuted the contentions in issue 5 (that a video of the defendant in shackles was among materials delivered to the juiy room when the trial court explicitly stated that the video was not sent to the jury) and issue 9 (that a standard jury instruction was not given when the record affirmatively demonstrated the jury instruction was given). Once the answer brief was received and reviewed, and certainly by the time of the filing of the reply brief, counsel should have immediately advised the Court and the State that he was withdrawing these issues.
 

 [9]
 

 . The four claims which we deny without additional analysis are claims 1, 10, 11, and 13. These claims are identical to claims that we recently rejected in
 
 Hunter v. State,
 
 8 So.3d 1052 (Fla.2008). Specifically, in claim 1, counsel invites this Court to recede from prior precedent and to apply heightened protections of the due process clause to citizens accused of committing a crime based on article I, section 9, of the Florida Constitution. In claim 10, Mosley alleges that Florida's death penalty scheme violates the Sixth Amendment and
 
 Ring v. Arizona,
 
 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). In claim 11, Mosley alleges that this Court’s comparative proportionality review is legally insufficient and unconstitutional. In claim 13, Mosley asserts that lethal injection and Florida's lethal injection procedures are unconstitutional. For the reasons already addressed in
 
 Hunter,
 
 we summarily deny each of
 
 *519
 
 these claims. Moreover, as to Claim 10, the
 
 Ring
 
 claim, Mosley was convicted of a prior violent felony.
 
 See Frances v. State,
 
 970 So.2d 806, 822-23 (Fla.2007) (rejecting a
 
 Ring
 
 argument in light of prior violent felony aggravator based on contemporaneous convictions for murder),
 
 cert. denied,
 
 553 U.S. 1039, 128 S.Ct. 2441, 171 L.Ed.2d 241 (2008). As to claim 13, the general attack on Florida’s lethal injection procedures, we have repeatedly rejected this claim.
 
 See, e.g., Ven-tura v. State,
 
 2 So.3d 194 (Fla.2009),
 
 cert. denied,
 
 No. 08-10098, — U.S. -, 129 S.Ct. 2839, 174 L.Ed.2d 562 (U.S. June 22, 2009);
 
 Tompkins v. State,
 
 994 So.2d 1072 (Fla.2008),
 
 cert.
 
 denied, - U.S. -, 129 S.Ct. 1305, — L.Ed.2d - (2009);
 
 Lightbourne v. McCollum,
 
 969 So.2d 326 (Fla.2007),
 
 cert. denied,
 
 553 U.S. 1059, 128 S.Ct. 2485, 171 L.Ed.2d 777 (2008).
 

 [10]
 

 . We have renumbered these subclaims.
 

 [11]
 

 . Finally, Mosley attempts to circumvent this problem by asserting that in Florida, it is impossible to have any privileged conversation with one’s spouse if one is incarcerated because even in-person conversations are recorded. According to Mosley, this eliminates the spousal privilege, which is impermissible state action. However, Mosley does not allege that he requested any opportunity to have a private conversation with his wife, and we do not consider that this argument has merit under the circumstances of this case.
 

 [12]
 

 . At trial, the court permitted Mosley to question Griffin about his record but did not permit Mosley to question Griffin as to statements that he made to his probation officer relating to whether he committed the drug offense.
 

 [13]
 

 . According to the State, Swearingen did not identify the baby as Jay-Quan.
 

 [14]
 

 . As this Court has recognized, "Direct evidence is that to which the witness testifies of his own knowledge as to the facts at issue. Circumstantial evidence is proof of certain facts and circumstances from which the trier of fact may infer that the ultimate facts in dispute existed or did not exist."
 
 Baugh v. State,
 
 961 So.2d 198, 203 n. 5 (Fla.2007) (quoting
 
 Davis v. State,
 
 90 So.2d 629, 631 (Fla.1956)).