55 So.3d 543 (2010)
Paul DUROUSSEAU, Appellant,
v.
STATE of Florida, Appellee.
No. SC08-68.
Supreme Court of Florida.
December 9, 2010.
Rehearing Denied February 21, 2011.
*548 Nancy A. Daniels, Public Defender, and Nada M. Carey, Assistant Public Defender, Second Judicial Circuit, Tallahassee, FL, for Appellant.
Bill McCollum, Attorney General, and Thomas D. Winokur, Assistant Attorney General, Tallahassee, FL, for Appellee.
PER CURIAM.
Paul Durousseau appeals his conviction of first-degree murder and sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla.Const. For the reasons set forth below, we affirm both his conviction and death sentence.

FACTS
On June 28, 2007, Durousseau was sentenced to death in the Fourth Judicial Circuit in and for Duval County, Florida, after being convicted of first-degree murder for the strangulation murder of Tyresa Mack. The evidence presented at trial established the following facts. On July 26, 1999, between the hours of 9:30 a.m. and 1 p.m., Mack and a friend applied for employment at various business establishments. Eyewitnesses placed Durousseau at Mack's Jacksonville apartment sometime between noon and 2 p.m. One of the eyewitnesses saw Durousseau carrying a television out of the apartment and watched as he placed it in his car. The last time anyone heard from Mack was *549 around 1:25 p.m. that afternoon when Mack spoke with a friend on the phone. Mack did not pick her children up from daycare that day and missed a 3 p.m. doctor's appointment for her youngest child. Around 7 p.m. that same evening, Mack's sister and her stepfather went to Mack's apartment in an attempt to locate her. At that time, they discovered Mack's body, lying in a semi-fetal position on the bed. Her body was nude from the waist down and a white cord was wrapped around her neck. The living room television and a "X's and O's" necklace and bracelet set that Mack always wore were missing. Durousseau's DNA was found in Mack's vagina and the medical examiner concluded that Mack died from asphyxia.
On June 23, 2003, Durousseau was indicted on five counts of first-degree murder for the murders of Nichole Williams, Nikia Kilpatrick, Shawanda McCallister, Jovanna Jefferson, and Surita Cohen. The similar methodology employed by the perpetrator, as well as DNA evidence from each crime scene, caused investigators to conclude that Mack was one of Durousseau's victims. On August 26, 2003, Durousseau was arrested for the murder of Mack. While in the booking area, Detective Rodney McKean informed Durousseau that he was being formally charged with the murder of Mack. Durousseau stated, "I don't know no [Tyresa] Mack." When the police informed him that Mack had been murdered on Florida Avenue, Durousseau responded, "I don't know that girl." On September 4, 2003, Durousseau was charged, by separate indictment, with the murder of Mack. The trial court permitted the State to introduce Williams[1] rule evidence of the Kilpatrick and McCallister murders. At the close of the State's evidence, Durousseau moved for judgment of acquittal, which was denied. On June 8, 2007, the jury found Durousseau guilty of first-degree murder.
During the penalty phase, the State alleged the existence of four aggravators: (1) Durousseau was previously convicted of a felony involving the use or threat of violence, (2) the murder was committed while the defendant was engaged in the commission of a robbery or sexual battery, (3) the murder was committed for pecuniary gain, and (4) the murder was especially heinous, atrocious, or cruel (HAC). Durousseau asserted the existence of the following statutory mitigating circumstances: (1) Durousseau's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired at the time he committed the murder, and (2) Durousseau suffered from an extreme mental or emotional disturbance at the time of the murder. He presented two mental health experts and seventeen lay witnesses. Durousseau also presented evidence of seventeen nonstatutory mitigators.
The jury recommended the death penalty by a vote of ten to two. Following a Spencer[2] hearing, the trial court imposed a sentence of death after finding the four requested aggravators,[3] rejecting both of *550 the requested statutory mitigators,[4] and finding sixteen of the seventeen nonstatutory mitigators.[5] The trial court gave great weight to the jury recommendation of death and concluded that the aggravating circumstances outweighed the mitigating circumstances. Accordingly, the trial court sentenced Durousseau to death. This appeal followed.
Durousseau now raises five issues: (1) the trial court erred in admitting Williams rule evidence of the two other murders, (2) the trial court erred in denying Durousseau's motion for judgment of acquittal of felony murder with robbery as the underlying offense and that the evidence is legally insufficient to support the pecuniary gain aggravator, (3) the trial court erred in rejecting an expert's opinion testimony regarding mental mitigation in favor of conflicting lay testimony, (4) the evidence was insufficient to support a first-degree murder conviction, and (5) the trial court erred in denying Durousseau's motion to declare Florida's capital sentencing scheme unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

GUILT PHASE

Williams Rule Evidence
In his first claim, Durousseau asserts that the trial court erred in admitting Williams rule evidence of two other murders. Prior to trial, the State filed a "Notice of Other Crimes, Wrongs or Acts Evidence," pursuant to section 90.404(2), Florida Statutes (1999), indicating that the State wished to introduce similar fact evidence at trial that Durousseau had also murdered Kilpatrick and McCallister. In response, Durousseau filed a motion in limine asking that the trial court exclude evidence of the collateral murders. In its memorandum supporting admissibility of the similar fact evidence, the State argued that each of the five collateral crime homicides were admissible, but stated that it chose to limit the evidence to the Kilpatrick *551 and McCallister homicides in order to "(1) facilitate more streamlined discovery and a quicker more efficient trial, and (2) to avoid similar crime evidence becoming a feature of the trial." On June 16, 2006, the parties filed a joint stipulation of facts for the "Similar Fact Evidence" hearing. The joint stipulation enumerated twenty-nine facts regarding the Mack murder and twenty-nine facts regarding the Kilpatrick and McCallister murders. After the hearing on June 28, 2006, the trial court denied defense counsel's motion in limine and ruled that the evidence was admissible, stating:
[W]hat the state can, I believe, prove at trial if this evidence is allowed in is that we have three young women in their early 20's, all black, all young mothers, all in similarly struggling situations, all found dead with home use wire wrapped around their necks, all with the DNA of Mr. Durousseau somewhere on or around their person and two of which or at least one of which without question he was seen with. I believe the state has shown the Williams Rule is sufficientlynot only relevant but that the similarities are sufficiently clear and convincing and that it should be admitted.
Durousseau now argues that the trial court erred in admitting the evidence because (1) the State did not meet its burden of proving that Durousseau committed the collateral crimes, (2) the collateral crimes did not exhibit unique or sufficiently unusual facts to establish modus operandi sufficient for proving identity, (3) the danger of any unfair prejudice far outweighed any probative value, and (4) the collateral crime evidence became an impermissible feature of the trial.
As codified in section 90.404(2)(a), Florida Statutes (1999), "[s]imilar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." However, such evidence is "inadmissible when the evidence is relevant solely to prove bad character or propensity." § 90.404(2)(a), Fla.Stat. (1999).[6] This type of evidence is known as Williams rule evidence. "The test of admissibility [of Williams rule evidence] is relevancy. The test of inadmissibility is a lack of relevancy." Williams, 110 So.2d at 660. However, even if relevant, a trial court may not permit the collateral crime evidence to become an impermissible feature of the trial. Collateral crime evidence becomes an impermissible feature of the trial when inquiry into the crimes "transcend[s] the bounds of relevancy to the charge being tried" and the prosecution "devolves from development of facts pertinent to the main issue of guilt or innocence into an assault on the character of the defendant." Williams v. State, 117 So.2d 473, 475 (Fla.1960). Based upon these legal principles, we find that the trial court did not abuse its discretion in admitting the Williams ruled evidence presented at Durousseau's trial.
First, we conclude that the collateral crime evidence established that Durousseau committed substantially similar crimes on two other occasions, which was *552 relevant to several material issues, including identity and premeditation. See, e.g., Conde v. State, 860 So.2d 930, 945 (Fla. 2003) (upholding admission of Williams rule evidence where defendant was on trial for strangulation of a prostitute and the State introduced evidence of five other murders as relevant to identity, intent, and premeditation); Bradley v. State, 787 So.2d 732, 741-42 (Fla.2001) (affirming admission of collateral crime evidence that was relevant to prove intent and premeditation); Mason v. State, 438 So.2d 374, 377 (Fla.1983) (finding admission of collateral crime evidence to prove identity proper where the crimes were close in time and location, the defendant's fingerprints were found at each scene, and the perpetrator used knives found inside of each home in each crime). The Williams rule evidence was clearly relevant given Durousseau's theory of defense that an unknown person entered Mack's apartment and killed her almost immediately after she engaged in consensual intercourse with Durousseau. See e.g., Conde, 860 So.2d at 945 (finding evidence of five collateral crime murders relevant to prove premeditation and refute defendant's theory that he killed in an "instantaneous combustion" of unexpected emotion); Wuornos v. State, 644 So.2d 1000, 1004, 1006-07 (Fla.1994) (finding evidence of six prior murders relevant to prove premeditation to refute defendant's defense that she acted in self-defense).
Second, we hold that the collateral crime evidence did exhibit unique similarities that established a modus operandi sufficient for proving identity. Pursuant to section 90.404(2)(a), evidence of other crimes, acts or wrongs is admissible to prove identity. E.g., Buenoano v. State, 527 So.2d 194, 197 (Fla.1988). We have explained:
[I]n cases where the purported relevancy of the collateral crime evidence is the identity of the defendant, we have required "identifiable points of similarity" between the collateral act and the charged crime that "have some special character or [are] so unusual as to point to the defendant." Drake v. State, 400 So.2d 1217, 1219 (Fla.1981). This is because "[t]he mode of operating theory of proving identity is based on both the similarity of and the unusual nature of the factual situations being compared." Id. Thus, "[a] mere general similarity will not render the similar facts legally relevant to show identity." Id.

Peterson v. State, 2 So.3d 146, 153 (Fla.) (alterations in original) (quoting McLean v. State, 934 So.2d 1248, 1255 (Fla.2006)), cert. denied, ___ U.S. ____, 130 S.Ct. 208, 175 L.Ed.2d 144 (2009). Durousseau contends that the collateral crime evidence should not have been admitted because the only similarities between the charged crime and the collateral crimes were general in nature and, therefore, he contends that the State failed to meet the heightened uniqueness burden required for identity. "The Court considers both similarities and dissimilarities between the collateral crimes and the charged offense when reviewing whether a `sufficiently unique pattern of criminal activity [justifies] admission.'" Id. (alteration in original) (quoting Peek v. State, 488 So.2d 52, 55 (Fla.1986)). In the instant case, there are identifiable points of similarity that pervade the compared factual situations. The facts in the charged crime and collateral crimes established that each victim was a young, black woman of similar stature,[7] who either had young children, was *553 pregnant, or both.[8] Each victim was found partially nude from the waist down in or near her bedroom with a home-use cord wrapped around her neck. The cause of death in each homicide was asphyxiation. Durousseau's DNA was found inside of, or near, each victim's person, although his fingerprints were not found at any of the crime scenes. Each victim lived along the St. Johns River and their apartments were within a five-mile radius of each other.
Durousseau contends that those similarities are merely general in nature and claims that there was much dissimilarity at each crime scene. Durousseau notes that the cords found around each of the victims' necks were different and had been tied or draped around each victim's neck in a different manner. He also claims that each victim's body exhibited different physical trauma. However, "[t]his Court has never required the collateral crime to be absolutely identical to the crime charged." Gore v. State, 599 So.2d 978, 984 (Fla.1992). Dissimilarities are not fatal when they "seem to be a result of differences in the opportunities with which [the defendant] was presented, rather than differences in modus operandi." Id.; see Chandler v. State, 442 So.2d 171, 173 (Fla.1983). A review of the record makes clear that the dissimilarities between the crimes, as alleged by Durousseau, are merely differences in opportunity. The different ligatures used in each homicide do not amount to dissimilarity, as suggested by Durousseau. It is not the difference of the home-use cord type, but his employment of the same tactic to obtain a murder weapon in each case that makes the home-use cords a similarity. Each victim appeared to have been bound or restrained in some way. Mack's arms exhibited indentations consistent with ligature bindings. Kilpatrick's arms and legs exhibited indentations consistent with ligature bindings, but, due to the level of decomposition, the medical examiner was unable to determine whether ligatures had in fact been used. McCallister's feet were bound, a belt had been wrapped around her wrist, and her arms exhibited marks consistent with having been bound. Additionally, appliance cords were missing from several of the crime scenes. The presence of indentations on each victim and the absence of the cords points to a similarity, rather than a dissimilarity. Further, each victim sustained different types of trauma, which indicates that each victim may have reacted or fought back in a different manner.[9] Thus, the dissimilarities cited by Durousseau are more correctly categorized as differences in the opportunities presented to Durousseau.
Additionally, Durousseau alleges that the charged and collateral crimes are too remote in time because Kilpatrick and McCallister were killed three and one-half years after Mack. "[R]emoteness of a prior crime is one aspect of its relevance, its tendency to prove or disprove a material fact in issue." Duffey v. State, 741 So.2d 1192, 1197 (Fla.4th DCA 1999) (citing McGough v. State, 302 So.2d 751, 754 (Fla.1974)); see Williams, 110 So.2d at 662; Griswold v. State, 77 Fla. 505, 82 So. 44, 49 (1919); § 90.401, Fla. Stat. (1997). In such an instance, "the trial court must *554 consider not the passage of time alone, but the effect of the passage of time on the evidence. . . . [It] precludes the use of evidence that has become unverifiable." Duffey, 741 So.2d at 1197 (quoting Heuring v. State, 513 So.2d 122, 123 (Fla.1987)). "[T]he trial court should take into account that the `absence of similar conduct for an extensive period of time which might suggest that the conduct has ceased to be a characteristic of the defendant.'" Duffey, 741 So.2d at 1197 (quoting Heuring, 513 So.2d at 124). This Court has upheld the admission of similar fact evidence occurring twenty years before the charged offenses where "the passage of time . . . did not affect the reliability of the evidence." Heuring, 513 So.2d at 124. In the case at bar, there is nothing to suggest that the passage of a little over three years affected the reliability of the evidence. See, e.g., Burke v. State, 835 So.2d 286, 289 (Fla. 5th DCA 2002) (ruling that the passage of twenty-two years did not taint the evidence nor prejudice the defendant). Nor is there any indication that the conduct ceased to be a characteristic of Durousseau.
Next, we conclude that the probative value of the collateral crime evidence substantially outweighed any danger of unfair prejudice. Relevant similar fact evidence that is admissible under section 90.404(2) is subject to the requirements of section 90.403, Florida Statutes (1999). Such evidence is inadmissible "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or needless presentation of cumulative evidence." § 90.403, Fla.Stat. (1999). Most evidence that is admitted will have a prejudicial or damaging effect to the party against whom it is offered. See Wuornos, 644 So.2d at 1007. "The real question is whether that prejudice is so unfair that it should be deemed unlawful." Id. The probative value of collateral crime evidence in the instant case comes from the fact that the collateral crimes were committed with a unique modus operandi that was the same as that used in the crime in question; therefore, it may be inferred that the same person committed both crimes. In determining whether the probative value is substantially outweighed by unfair prejudice, the court should consider the effectiveness of the cautionary instruction. Bennett v. State, 593 So.2d 1069 (Fla.1st DCA) (citing United States v. Clemons, 676 F.2d 122 (5th Cir.1982)), quashed on other grounds, 599 So.2d 997 (Fla.1992).
In the instant case, the trial court provided the jury with a limiting instruction as to the proper purpose of the collateral crime evidence prior to the State's introduction of the collateral crime evidence. The trial court instructed the jury as to the proper purpose of the evidence:
THE COURT: Members of the jury, before this witness begins her testimony the evidence you are about to receive concerning evidence of other crimes allegedly committed by the defendant will be considered by you for the limited purpose of proving motive, intent, identity, or the absence of mistake or accident on the part of the defendant and you shall consider it only as it relates to those issues. Let's proceed.
At the close of the evidence, a similar limiting instruction must be given. See § 90.404(2)(b)2, Fla.Stat. (1999); McLean v. State, 934 So.2d 1248 (Fla.2006). Here, at the close of all of the evidence, the trial court did provide a similar instruction:
THE COURT: As to the killing of Nikia Kilpatrick, the evidence which has been admitted to show similar crimes, wrongs, or acts allegedly committed by the defendant will be considered by you only as that evidence relates to proof of *555 motive, intent, identity, or the absence of mistake or accident on the part of the defendant.
As to the killing of Shawanda McCallister, the evidence which has been admitted to show similar crimes, wrongs, or acts allegedly committed by the defendant will be considered by you only as that evidence relates to proof of intent, identity, or the absence of mistake or accident on the part of the defendant.
When collateral crime evidence is introduced, the trial court need only instruct the jury at the time of admission, if so requested, and after the close of the evidence. Rivers v. State, 425 So.2d 101, 102 (Fla.1st DCA 1982). Here the trial court did both.
As to Durousseau's fourth claim, we hold that the collateral crime evidence did not become an impermissible feature of the trial. Durousseau argues that the collateral crime evidence became an impermissible feature of the trial because the presentation of the collateral crime evidence composed two-thirds of the trial. Allowing the collateral crime evidence to become an overwhelming feature of the trial is reversible error. Bush v. State, 690 So.2d 670, 673 (Fla.1st DCA 1997). However, this Court has stated that "collateral crime evidence does not become an impermissible feature of the trial simply because it is voluminous." Peterson, 2 So.3d at 156 (citing Townsend v. State, 420 So.2d 615 (Fla.4th DCA 1982)). In the instant case, the State introduced collateral crime evidence of the Kilpatrick and McCallister murders to prove identity. Out of the six murders for which Durousseau had been indicted, the State limited the collateral crime evidence to only the Kilpatrick and McCallister murders in order to "(1) facilitate more streamlined discovery and a quicker, more efficient trial and (2) to avoid similar crime evidence becoming a feature of the trial." Additionally, the trial court gave a limiting instruction to the jury as to the proper purpose of the evidence prior to its admission and at the close of the evidence as required under section 90.404(2)(c)2. At trial, the State presented testimony from only one medical examiner, one serologist,[10] and one detective regarding the Mack, Kilpatrick, and McCallister murders. Throughout the three-week trial, eight lay witnesses testified over a period of only one day regarding Kilpatrick's murder. In addition, over a period of one-and-one-half days, eight witnesses testified regarding the McCallister murder. Approximately three hundred exhibits were placed into evidence throughout the trial. The State introduced approximately thirty-eight photographs from McCallister's case and approximately fourteen photographs from Kilpatrick's case. These photos were all introduced to show similarities between the crime scenes. Thus, the trial court did not allow the similar fact evidence to become an impermissible feature of the trial.
Last, Durousseau contends that the trial court erred in failing to provide a special instruction to the jury as requested by defense counsel. Durousseau argues that the failure to do so led to juror confusion because the standard instruction did not distinguish between the burden of proof for the primary crime and collateral crimes. He also asserts that juror confusion resulted because the standard instruction did not make it clear whether the jury had to find that Durousseau actually committed the collateral crimes. We disagree. The decision to provide a particular instruction to the jury *556 is within the discretion of the trial court. Duest v. State, 855 So.2d 33, 41 (Fla.2003) (citing Card v. State, 803 So.2d 613, 624 (Fla.2001)). "Weighing the evidence is the sole prerogative of the jury and the trial court should give an instruction without weighing the evidence." Cruz v. State, 971 So.2d 178, 182 (Fla.5th DCA 2007) (citing Mathews v. State, 799 So.2d 265, 266 (Fla.1st DCA 2001)). When collateral crime evidence is introduced, the trial court need only instruct the jury at the time of admission, if so requested, and after the close of the evidence. Rivers, 425 So.2d at 102. Here the trial court did both. "[T]o be entitled to a special jury instruction, [the defendant] must prove that: (1) the special instruction [is] supported by the evidence; (2) the standard instruction [does] not adequately cover the theory of defense; and (3) the special instruction [is] a correct statement of the law and not misleading or confusing." Wheeler v. State, 4 So.3d 599, 605 (Fla.2009) (second alteration in original) (quoting Stephens v. State, 787 So.2d 747, 756 (Fla.2001)). The trial court's limiting instructions prior to the presentation of the evidence and at the close of the evidence precluded any juror confusion that could have resulted from admission of the collateral crime evidence. The jurors were aware that the collateral crimes were admitted for the limited purposes of identity or premeditation. Once admitted, Williams rule evidence is treated like any other evidence that the jury may accept or reject. Thus, the trial court did not err in failing to instruct the jury that they had to find Durousseau committed the collateral crimes. Accordingly, we hold that the trial court did not abuse its discretion in admitting the Williams rule evidence.

Motion for Judgment of Acquittal
Durousseau also contends that the trial court erred in denying his motion for judgment of acquittal. "It is the trial judge's proper task to review the evidence to determine the presence or absence of competent evidence from which the jury could infer guilt to the exclusion of all other inferences." State v. Law, 559 So.2d 187, 189 (Fla.1989). A trial court's denial of a motion for judgment of acquittal is reviewed de novo to determine solely if the evidence is legally sufficient. See Jones v. State, 790 So.2d 1194, 1196-97 (Fla.1st DCA 2001). This Court has stated:
As a general proposition, an appellate court should not retry a case or reweigh conflicting evidence submitted to a jury or other trier of fact. Rather, the concern on appeal must be whether, after all conflicts in the evidence and all reasonable inferences therefrom have been resolved in favor of the verdict on appeal, there is substantial, competent evidence to support the verdict and judgment. Legal sufficiency alone, as opposed to evidentiary weight, is the appropriate concern of an appellate tribunal.
Tibbs v. State, 397 So.2d 1120, 1123 (Fla.1981) (footnotes omitted).
Durousseau contends that the trial court erred in denying his motion for judgment of acquittal as to the robbery charge because the evidence is insufficient to support his conviction of first-degree murder based upon felony murder with robbery as the underlying predicate. Durousseau argues that the robbery charge was based on circumstantial evidence and contends that circumstantial evidence is insufficient to prove robbery as the predicate for felony murder. We disagree. In criminal cases, Florida law permits the State to rely on circumstantial evidence to prove the guilt of a defendant. See Stewart v. State, 158 Fla. 753, 30 So.2d 489, 491 (1947). When faced with a motion for judgment of acquittal in a circumstantial evidence case, the trial court must determine *557 whether there is a prima facie inconsistency between the evidence, viewed in light most favorable to the State, and the defense theory or theories. See Reynolds v. State, 934 So.2d 1128, 1145-46 (Fla.2006). Under the circumstantial evidence standard, when there is an inconsistency between the defendant's theory of innocence and the evidence, when viewed in a light most favorable to the State, the question is one for the finder of fact to resolve and the motion for judgment of acquittal must be denied. See Floyd v. State, 850 So.2d 383 (Fla.2002). We have held, "The state is not required to `rebut conclusively every possible variation' of events which could be inferred from the evidence, but only to introduce competent evidence which is inconsistent with the Defendant's theory of events." Law, 559 So.2d at 189 (footnote omitted) (quoting State v. Allen, 335 So.2d 823, 826 (Fla.1976)). If the State has presented evidence to support every element of the crime, then a motion for judgment of acquittal must be denied and the denial affirmed on appeal. See State v. Williams, 742 So.2d 509, 511 (Fla.1st DCA 1999). "Once that threshold burden is met, it becomes the jury's duty to determine whether the evidence is sufficient to exclude every reasonable hypothesis of innocence beyond a reasonable doubt." Law, 559 So.2d at 189. "This determination is for the jury and where there is substantial, competent evidence to support the jury verdict, that determination will not be disturbed by the courts." Toole v. State, 472 So.2d 1174, 1176 (Fla.1985) (citing Heiney v. State, 447 So.2d 210, 212 (Fla.1984)).
Under Florida law, "robbery" is defined as:
[T]he taking of money or other property which may be the subject of larceny from the person or custody of another, with intent to either permanently or temporarily deprive the person or the owner of the money or other property, when in the course of the taking there is the use of force, violence, assault, or putting in fear.
§ 812.13(1), Fla.Stat. (1999). The phrase "in the course of the taking" means the theft "occurs either prior to, contemporaneous with, or subsequent to the taking of the property and if it and the act of taking constitute a continuous series of acts or events." § 812.13(3)(b), Fla.Stat. (1999). Here, the State presented evidence that Mack's bedroom had been ransacked, her television was missing, her "X's and O's" necklace and bracelet were missing, and the contents of her purse had been dumped out and were scattered around her dead body. Two eyewitnesses, Pinkney and Williams, placed Durousseau at Mack's apartment around the time of the murder. Williams testified that she saw Durousseau calmly carry a television out of Mack's apartment and place it in his car. Thus, the record evidence in the instant case reveals that there was an inconsistency between the defendant's theory and the evidence and that the State presented evidence to support each element of the crime of robbery.
Furthermore, Durousseau argues that the State failed to meet its burden because it was more reasonable to infer that the items were taken as an afterthought. In support of this contention, Durousseau points out that there were "numerous items, such as money, other jewelry, . . . [and] other electronics and belongings in the home [that] were not taken." We disagree. The failure to take all of the victim's valuables alone is not necessarily dispositive of whether a robbery occurred, or of whether the taking was an afterthought. We have explained:
Where an "afterthought" argument is raised, the defendant's theory is carefully analyzed in light of the entire circumstances *558 of the incident. If there is competent, substantial evidence to uphold the robbery conviction, and no other motive for the murder appears from the record, the robbery conviction will be upheld. Conversely, in those cases where the record discloses that, in committing the murder, the defendant was apparently motivated by some reason other than a desire to obtain the stolen valuable, a conviction for robbery (or the robbery aggravator) will not be upheld.
Beasley v. State, 774 So.2d 649, 662 (Fla.2000) (citations omitted). In the case at bar, there is record evidence to support the robbery conviction and to rebut Durousseau's afterthought theory. In addition to the above mentioned, Pinkney and Williams both testified that Durousseau was behaving in a calm manner, which tends to negate any evidence that Durousseau was in a frenzy to flee or grabbed the items as an afterthought. Outside of his own testimony,[11] there was no evidence showing Durousseau and Mack had a relationship that would have served as the basis for some other motive for murdering Mack and taking her property. Additionally, the stolen items did not expedite or facilitate Durousseau's ability to flee the scene. Based on witness testimony, removal of the television actually consumed a considerable amount of time and effort. We have affirmed felony-murder convictions based upon robbery as the underlying felony where there is "an inconsistency between the evidence and appellant's assertion that any theft occurred as an afterthought." Hess v. State, 794 So.2d 1249, 1262 (Fla.2001). Based on the evidence presented, Durousseau's actions and the circumstances surrounding the incident in this case are clearly inconsistent with his contention that the takings were merely an afterthought. Moreover, the jury received an "independent act" or "afterthought" instruction, but rejected the theory, finding that Durousseau killed Mack during the course of a robbery. Accordingly, the trial court did not err in denying the motion for judgment of acquittal as to the robbery.

Pecuniary Gain Aggravator
Durousseau also contends that the trial court erred in finding the pecuniary gain aggravating factor in his case as the evidence was insufficient to prove a pecuniary motive for the murder beyond a reasonable doubt because it is at least as reasonable that the motive for the crime was sexual. The pecuniary gain aggravator is applicable in cases where "the murder was motivated, at least in part, by a desire to obtain money, property, or other financial gain." Finney v. State, 660 So.2d 674, 680 (Fla.1995). The pecuniary gain aggravator can be used to aggravate a felony murder conviction based on an underlying felony of robbery. See id. at 684. This Court's "task on appeal is to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent substantial evidence supports its finding." Willacy v. State, 696 So.2d 693, 695 (Fla.1997).
In the instant case, Mack was found lying on her side in a semi-fetal position, marks on her wrists and ankles indicated that she may have been bound, a ligature *559 was positioned around her neck, her bedroom had been ransacked, her television was missing, some of her jewelry was missing, and her purse had been dumped out on her bed. We have previously found the existence of sufficient evidence to support imposition of the pecuniary gain aggravator under similar circumstances. See Finney, 660 So.2d at 680 (upholding a finding of the pecuniary gain aggravator where the victim was found lying face down on her bed with her ankles and wrists tied, her bedroom had been ransacked, the defendant had pawned the victim's VCR shortly after the murder, the victim's jewelry box was missing, and the contents of the victim's purse had been dumped on the floor).
Further, Durousseau incorrectly contends that the State failed to meet its burden because it did not discredit his reasonable hypothesis of innocence. However, the State simply had to show that the murder was committed, at least in part, by a desire for pecuniary gain. See Finney, 660 So.2d at 680. Durousseau claims that his argument is proper because it is more reasonable to believe that the murder was motivated by the sexual battery. We disagree. We have previously affirmed a trial court's finding of the pecuniary gain aggravator where pecuniary gain was not the sole or primary motive. See Orme v. State, 25 So.3d 536, 550 (Fla.2009) (concluding that the trial court did not err in finding the pecuniary gain aggravator where the defendant beat, raped, and murdered the victim after she flushed his cocaine down the toilet), cert. denied, ___ U.S. ___, 130 S.Ct. 3391, 177 L.Ed.2d 309 (2010).
The record demonstrates that the trial court's finding of the pecuniary gain aggravator is supported by competent, substantial evidence. Here, the State introduced evidence indicating that Durousseau ransacked the apartment, intentionally searching for items of value. Durousseau also incorrectly argues that there can only be one motive for the murder, which he alleges is sexual battery. The fact that Mack had also been sexually battered along with the fact that Durousseau overlooked a few dollar bills in a cosmetic bag does not necessarily establish the absence of the motive of pecuniary gain. Accordingly, we affirm the trial court's finding of the pecuniary gain aggravator.

Sufficiency of the Evidence
In his fourth claim, Durousseau challenges the sufficiency of the evidence. Regardless of whether the appellant challenges the sufficiency of the evidence, in death penalty cases, this Court must conduct an independent review to determine whether sufficient evidence exists to support a first-degree murder conviction. See Insko v. State, 969 So.2d 992, 1002 (Fla.2007); Snelgrove v. State, 921 So.2d 560, 570 (Fla.2005). "Generally, an appellate court will not reverse a conviction which is supported by competent, substantial evidence." Pagan v. State, 830 So.2d 792, 803 (Fla.2002). "In determining the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt." Simmons v. State, 934 So.2d 1100, 1111 (Fla. 2006) (quoting Bradley v. State, 787 So.2d 732, 738 (Fla.2001)).
We conclude that the record contains competent, substantial evidence to support Durousseau's conviction for first-degree murder. First, at trial, the State established that Durousseau's DNA was found inside of Mack. The medical examiner testified that Durousseau's spermatozoa's heads and tails were still intact, indicating *560 that Durousseau had sexual intercourse with Mack within hours of her death. Second, the State presented evidence that Mack suffered from abrasions on her face and marks on her arms and also presented evidence that Mack had been sexually battered. Third, witness testimony placed Durousseau at the scene of the homicide within hours of Mack's death. Both Williams and Pinkney identified Durousseau as the man they saw around Mack's apartment on the day she was murdered. The witnesses testified that Durousseau was wearing a navy blue uniform. One of Durousseau's Goodyear coworkers testified that all employees were required to wear navy uniforms. Further, Pinkney testified that he saw Durousseau exit Mack's apartment building and look into the trunk of a red car. Additional testimony revealed that, at the time of Mack's murder in 1999, Durousseau owned a red Mazda. Fourth, Williams testified that she saw Durousseau place a television in the trunk of a red car. Mack's television set and matching necklace and bracelet that she wore everyday were missing from her home when her body was found. Durousseau claims that Mack sold the television to him because it was broken. However, several of Mack's friends testified that the television had been working that same week. Fifth, the last contact Mack had with anyone was by phone between 1 and 1:30 p.m. that day, and testimony revealed that Durousseau took his lunch break between 12 and 1:30 p.m. that same day. A friend testified that she tried to contact Mack around 2:50 p.m., but Mack did not answer the phone. Mack's children and Durousseau's children attended the same small daycare. However, Durousseau denied knowing Mack on multiple occasions. Later, Durousseau claimed that he did know Mack and that he had a sexual relationship with her. Finally, the State established that Mack had been bound and sexually battered and died as a result of asphyxia caused either by strangulation or suffocation.
Based on a review of the evidence presented in this case, a "rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt." Simmons v. State, 934 So.2d at 1111 (quoting Bradley, 787 So.2d at 738). Accordingly, we find the evidence sufficient to support Durousseau's first-degree murder conviction.

PENALTY PHASE

Conflicting Opinion Testimony
Next, Durousseau argues that the trial court erred in rejecting the unrebutted opinion of the mental health expert regarding Durousseau's mental mitigation. This Court will not disturb a trial court's rejection of a mitigating circumstance if the record contains competent, substantial evidence to support the trial court's rejection of the mitigation. See Spencer v. State, 645 So.2d 377, 381, 385 (Fla.1994); Nibert v. State, 574 So.2d 1059, 1062 (Fla.1990). There must be a rational basis for the trial court's rejection of such mitigation at a capital sentencing proceeding. Lebron v. State, 982 So.2d 649, 660 (Fla.2008). "[T]he trial court may accept or reject the testimony of an expert witness just as the judge may accept or reject the testimony of any other witness." Roberts v. State, 510 So.2d 885, 894 (Fla.1987). The trial court is entitled to reject apparently unrebutted testimony of a defense mental health expert if the trial court finds that the facts do not support the testimony. See generally Nelson v. State, 850 So.2d 514, 531 (Fla.2003).
We have articulated a distinction between factual evidence and opinion testimony. "As a general rule, uncontroverted factual evidence cannot simply be rejected unless it is contrary to law, improbable, *561 untrustworthy, unreasonable, or contradictory." Walls v. State, 641 So.2d 381, 390 (Fla.1994) (citing Brannen v. State, 94 Fla. 656, 114 So. 429 (1927)). "This rule applies equally to the penalty phase of a capital trial." Walls, 641 So.2d at 390. We further stated that "[o]pinion testimony, on the other hand, is not subject to the same rule," and explained that "[c]ertain kinds of opinion testimony clearly are admissibleand especially qualified expert testimonybut they are not necessarily binding even if uncontroverted. Opinion testimony gains its greatest force to the degree it is supported by the facts at hand, and its weight diminishes to the degree such support is lacking." Walls, 641 So.2d at 390-91. Moreover, "[a] debatable link between fact and opinion relevant to a mitigating factor usually means, at most, that a question exists for judge and jury to resolve." Id. at 391.
During the penalty phase, defense expert Dr. Dorothy Lewis testified that, in her opinion, Durousseau suffered from bipolar mood disorder and schizoaffective disorder. Dr. Lewis further testified that, in her opinion, assuming Durousseau murdered Mack, Durousseau was unable to conform his conduct to the requirements of the law and that he was under an extreme mental or emotional disturbance at the time of the murder. Durousseau claims that the trial judge improperly rejected the mitigation in favor of the judge's own personal opinion. In support of this argument, Durousseau refers the judge's statement that the expert's descriptions of his illness were not "indicative, from a layperson's viewpoint, of a person with a mood disorder." A trial judge cannot reject an uncontroverted expert opinion regarding a medical diagnosis in favor his or her own unqualified lay opinion. See Alamo Rent-A-Car v. Phillips, 613 So.2d 56, 58 (Fla.1st DCA 1992). In the present case, the trial judge found that certain lay testimony regarding Durousseau's behavior as a child and as an adult was in conflict with the expert's opinion that Durousseau suffered from bipolar mood disorder and would have exhibited signs and symptoms of bipolar mood disorder since early childhood. In the Sentencing Order, the trial judge explained:
To support this opinion, Dr. Lewis relied upon information that the Defendant cried a lot as a young child; would fool around and was kind of difficult to manage; took many risks; talked in class, and sometimes talked and talked without being able to shut-up. She described him as having grandiose ideas about his own persona, citing his statement to her that he was "irresistible to women." She considered interviews with girlfriends who testified that sometimes he wanted sex constantly and then other times he did not seem interested. She also considered the Defendant's statement that sometimes he just stayed in his room and didn't want to go out and see people. She also considered the Turner Syndrome studies and hypothyroidism, as previously discussed.
The Court is aware that it may not have received the identical information regarding the Defendant's history that was received by Dr. Lewis, however, it did receive penalty phase testimony from many witnesses including family and friends. Those who knew the Defendant years ago, gave vastly different accounts of the Defendant's younger days than those relied upon by Dr. Lewis.
Dr. Lewis stated that the Defendant was difficult to manage as a child. Delores Sheen, the principal at Sheenway Educational and Cultural Center, where the Defendant attended school from 1985 to 1987 testified that she never once had to discipline him. Although *562 records substantiate that he was not a good student, he participated in all school activities and attended school there five or six days per week.
June Orr, a close family friend of his mother, described him as humorous, a nice child, always willing to help and lend a hand to others. Family friends Latonya Street and Kiana Michelle Williams Medina testified he was always respectful, courteous and polite.
Dr. Lewis had information that the Defendant was a "risk taker." John Simms, a close friend of Defendant's brother, Dennis Paige, testified the Defendant shied away from physical contact because he was afraid of getting hurt. Because of this fear, he did not participate in sports other than running track. According to Mr. Simms, he was kind of "shy and meek," but he was "always positive."
His cousin, Eric Moten, who was raised with the Defendant and his brothers, described him as "always together," and the one who was "the easiest going of us all." He further stated, "I never saw him do anything out of line." Mrs. Medina described him this way:
He made every effort to keep things balanced. I mean that was one thing that as a young man and as a man, he was very even-keeled, he wanted things to be smooth sailing, easy going, very laid back . . . You know, if things were in a despair mode, that all you could see was despair, he had a joke for you.
Although witnesses did verify that the Defendant cried a lot as a young child, these descriptions are not consistent with Dr. Lewis' information, nor indicative, from a layperson's viewpoint, of a person with a mood disorder.
Dr. Lewis found in her interviews with the Defendant that he has a grandiose opinion of his own persona. In reaching this conclusion, she referenced his statement that "he is irresistible to women." She found that this supported her opinion that he was in a manic state. Accepting that this was not said in jest, but noting that more than one witness described the Defendant as humorous, the Court finds Dr. Lewis' conclusion that this is indicative of a person in a manic state to be highly improbable.
The Defendant, in his testimony in the guilt phase of the trial, claimed to have had a very active sex life with a significant number of partners. He has fathered four children from three different women. Regardless of his opinion about himself, the evidence established that there are women who are attracted to him, or at least willing to have sexual relations with him, which might form a basis for his own conclusions.
Where expert testimony is admitted, it is still the sole province of the jury or court as trier of facts to accept or reject such testimony, even if it is uncontroverted. Wuornos, 644 So.2d at 1010. "[A] jury may reject expert medical testimony when there exists relevant, conflicting lay testimony . . . ." Weygant v. Fort Myers Lincoln Mercury, Inc., 640 So.2d 1092, 1094 (Fla.1994). The trial judge's role shifts to that of fact finder when considering aggravating and mitigating circumstances. See generally Spencer v. State, 842 So.2d 52 (Fla.2003). As a general rule, the trial court is in the best position to evaluate the credibility of witnesses, and appellate courts are obligated to give great deference to the findings of the trial court. Riggins v. State, 830 So.2d 920, 921 (Fla.4th DCA 2002); Porter v. State, 788 So.2d 917, 923 (Fla.2001) ("We recognize and honor the trial court's superior vantage point in assessing the credibility *563 of witnesses and in making findings of fact.").
In the instant case, Dr. Lewis did not testify that Durousseau's constellation of illnesses could only manifest itself from the time of infancy. She speculated that one or some of the conditions may have been genetic and that it was possible Durousseau suffered from those illnesses from a young age. Because she did not have any personal knowledge of Durousseau's behavior as a child, Dr. Lewis relied on information she obtained from Durousseau's mother as a basis for her testimony. However, the trial judge noted that the lay witness testimony regarding Durousseau's behavior as a child conflicted with the behavioral problems that Dr. Lewis testified would have been present in a child suffering from bipolar mood disorder or schizoaffective disorder. Testimony from many other family members, friends, teachers, and coworkers painted Durousseau as nice, quiet, and shy boy. Thus, the record reveals competent, substantial evidence supporting the trial judge's rejection of the mental mitigation. Accordingly, we find that the trial court did not abuse its discretion in rejecting the expert's opinion in favor of conflicting lay testimony regarding Durousseau's mental mitigation.

Ring Claim
Durousseau lacks standing to make a unanimity challenge to Florida's death penalty statute because in the guilt phase the jury unanimously found the that the murder was committed during the course of committing the felonies of robbery and sexual battery. See Burch v. Louisiana, 441 U.S. 130, 132 n. 4, 99 S.Ct. 1623, 60 L.Ed.2d 96 (1979). Furthermore, Durousseau asserts that Florida's capital sentencing scheme violates the United States Constitution under the holding of Ring. We have repeatedly rejected similar claims. See Victorino v. State, 23 So.3d 87, 107-08 (Fla.2009); Reynolds v. State, 934 So.2d 1128, 1160 (Fla.2006); Conde, 860 So.2d at 959; Chavez v. State, 832 So.2d 730, 767 (Fla.2002). We find that Durousseau is likewise not entitled to relief on this claim. We specifically note that one of the aggravating circumstances present in this matter is a prior violent felony conviction.

Proportionality
This Court has an independent obligation to review each case to ensure that the death sentence is appropriate under the totality of the circumstances in relation to other capital cases. Smith v. State, 28 So.3d 838, 875 (Fla.2009) petition for cert. filed, No. 09-10755 (U.S. May 10, 2010); Fla.R.App.P. 9.142(a)(6). This entails "a qualitative review by this Court of the underlying basis for each aggravator and mitigator rather than a quantitative analysis." Urbin v. State, 714 So.2d 411, 416 (Fla.1998). The death penalty is "reserved only for those cases where the most aggravating and least mitigating circumstances exist." Terry v. State, 668 So.2d 954, 965 (Fla.1996) (citing State v. Dixon, 283 So.2d 1, 7 (Fla.1973)). This Court will not disturb a trial judge's determination as to the weight assigned to each established aggravator or mitigator if that ruling is "supported by competent, substantial evidence in the record." Spencer v. State, 691 So.2d 1062, 1064 (Fla.1996).
In the instant matter, the jury recommended the death penalty by a vote of ten to two. The trial court found this recommendation appropriate after weighing the aggravating and mitigating circumstances. In imposing the death sentence, the trial court found the following four aggravating factors: (1) the murder was heinous, atrocious, or cruel (great weight), (2) the crime was committed while the defendant was *564 engaged in a robbery and sexual battery (great weight), (3) the murder was committed for pecuniary gain (little to moderate weight), and (4) Durousseau was previously convicted of a felony involving the use or threat of violence to the person (moderate to significant weight). The trial court rejected both statutory mitigators, found sixteen nonstatutory mitigating circumstances of relatively little weight, and rejected one nonstatutory mitigator. No significant mental health mitigation was found.
"[T]he heinous, atrocious, or cruel aggravator is one of the `most serious aggravators set out in the statutory sentencing scheme.'" Aguirre-Jarquin v. State, 9 So.3d 593, 610 (Fla.2009) (quoting Larkins v. State, 739 So.2d 90, 95 (Fla.1999)), cert. denied, ___ U.S. ____, 130 S.Ct. 1505, 176 L.Ed.2d 118 (2010). Further, this Court has upheld imposition of a death sentence where the prior violent felony aggravator was the only aggravator present. See, e.g., LaMarca v. State, 785 So.2d 1209, 1217 (Fla.2001); Ferrell v. State, 680 So.2d 390, 391 (Fla.1996). Moreover, this Court has repeatedly affirmed the death penalty in similar cases. See Mosley v. State, 46 So.3d 510, 517 (Fla.2009) (finding proportionality where the following four aggravators were present: (1) the victim was under the age of twelve; (2) the murder was cold, calculated, and premeditated; (3) the murder was committed for pecuniary gain; (4) the defendant was previously convicted of a capital felony. No statutory mitigation was found, but twenty-nine nonstatutory mitigators were found; none of which were particularly weighty); see also Hayward v. State, 24 So.3d 17, 46-47 (Fla.2009), cert. denied, ___ U.S. ____, 130 S.Ct. 2385, 176 L.Ed.2d 777 (2010); Carter v. State, 980 So.2d 473, 485-87 (Fla.2008); Johnson v. State, 660 So.2d 637, 641, 648 (Fla.1995); Melton v. State, 638 So.2d 927, 930-31 (Fla.1994). Thus, we find the imposition of the death sentence is proportionate in the instant case.
Accordingly, we affirm Durousseau's conviction of first-degree murder and sentence of death.
It is so ordered.
CANADY, C.J., and LEWIS, POLSTON, LABARGA, and PERRY, JJ., concur.
PARIENTE, J., dissents with an opinion, in which QUINCE, J., concurs.
PARIENTE, J., dissenting.
Without the collateral crimes, the evidence connecting Durousseau to the murder of Tyresa Mack was that he had sex with her shortly before she was murdered (Durousseau's DNA was found inside her), he was seen in the vicinity of her apartment around the time-frame she was likely murdered, and he denied knowing her when questioned by the police. Durousseau's DNA was not found on the cord wrapped round Mack's neck, and there was no other physical evidence tying him to the murder. Thus, the admission of the collateral murders of Nikia Kilpatrick and Shawanda McCallister was critical to identifying Durousseau as Mack's murderer.
I dissent because in my view the trial court failed to determine whether there was clear and convincing evidence that Durousseau committed the collateral crimes at issue in this casethe required threshold inquiry before admitting collateral crime evidence as proof of identity. Instead, the trial court found only that the similarities between the crimes were "sufficiently clear and convincing"which I conclude resulted in impermissible bootstrapping. Further, in my view, there was not clear and convincing evidence established in this record that Durousseau committed one of the collateral crimes without *565 reliance on the similarities between the collateral crime and the crime in question.
While substantial similarity is a critical determination before the collateral crime is admitted, the trial court must first make an initial and separate determination of whether the defendant in fact committed the collateral crimes. Before admitting collateral crime evidence, the trial court must make the following inquiries:
whether there is sufficient evidence that defendant committed the collateral crime; whether the collateral crime meets the similarity requirements necessary to be relevant; whether the collateral crime is too remote, so as to diminish its relevance; and whether the prejudicial effect of the collateral crime substantially outweighs its probative value.
Peterson v. State, 2 So.3d 146, 153 (Fla.) (citing Robertson v. State, 829 So.2d 901, 907-08 (Fla.2002)), cert. denied, ___ U.S. ___, 130 S.Ct. 208, 175 L.Ed.2d 144 (2009). The first inquiry is whether the defendant committed the collateral crime, which the State must establish by clear and convincing evidence. McLean v. State, 934 So.2d 1248, 1256 (Fla.2006) ("Before allowing Williams rule evidence to be presented to the jury, the trial court must find that the State has proved that the defendant committed the collateral acts by clear and convincing evidence."). To satisfy the clear and convincing standard,
the evidence must be found to be credible; the facts to which the witnesses testify must be distinctly remembered; the testimony must be precise and explicit and the witnesses must be lacking in confusion as to the facts in issue. The evidence must be of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established.
Acevedo v. State, 787 So.2d 127, 130 (Fla. 3d DCA 2001) (quoting Slomowitz v. Walker, 429 So.2d 797, 800 (Fla.4th DCA 1983)); see also Hernandez v. State, 16 So.3d 336, 340 (Fla.4th DCA 2009) ("To meet the clear and convincing standard, `[t]he evidence must be credible; the memories of the witnesses must be clear and without confusion; and the sum total of the evidence must be of sufficient weight to convince the trier of fact without hesitancy.'" (quoting J.F. v. Dep't of Children & Families, 890 So.2d 434, 439 (Fla.4th DCA 2004))). This inquiry is distinct from the second inquiry, which is whether the collateral crime is similar enough to be relevant.
The majority sidesteps the first inquiry by stating that the evidence established that Durousseau committed substantially similar crimes on two other occasions without explicitly considering whether there was clear and convincing evidence that he committed the two prior crimes. This is particularly problematic in this case because the trial court never determined that there was clear and convincing evidence that Durousseau committed the collateral crimes. Instead, the trial court admitted the evidence, stating:
What the state can, I believe, prove at trial if this evidence is allowed in is that we have three young women in their early 20's, all black, all young mothers, all in similarly struggling situations, all found dead with home use wire wrapped around their necks, all with the DNA of Mr. Durousseau somewhere on or around their person and two of which or at least one of which without question he was seen with. I believe the state has shown the Williams Rule is sufficientlynot only relevant but that the similarities *566 are sufficiently clear and convincing and that it should be admitted.
(Emphasis added.) Thus, in finding that the similarities between the crimes were "sufficiently clear and convincing," the trial court impermissibly conflated two separate requirements that must be found before a trial court can admit evidence of a collateral crime: (1) that there was clear and convincing evidence that the defendant committed the collateral crime; and (2) that the collateral crime meets the similarity requirements necessary to be relevant.
The State concedes that clear and convincing evidence must establish that the defendant committed the collateral crime. However, the State asserts that in cases of "serial murderers," it needs to rely on the similarities between the crimes as proof that the defendant committed the collateral crime. However, this conflation of the requirements for admission of the evidence is in essence an attempt to "bootstrap" similarities between crimes to prove that the defendant committed the collateral crimewhich is impermissible because the collateral crime must be proven independent of its similarity to the crime for which the defendant is being tried. See Acevedo, 787 So.2d at 130 ("[T]he State's attempt to bootstrap the similarities of the 1995 fire to those of the 1971 fire in order to prove that the defendant started the 1971 fire was equally inappropriate."). Allowing a trial court to admit collateral crime evidence solely on the basis of the similarity of the crimes makes it possible to admit the evidence without first connecting the defendant to the collateral crime through the presentation of clear and convincing evidencea violation of our case law and due process.
The danger of admitting collateral crime evidence is that "the jury will convict the defendant based on prior crimes because these unrelated crimes would `go far to convince [individuals] of ordinary intelligence that the defendant was probably guilty of the crime charged. But, the criminal law departs from the standard of the ordinary in that it requires proof of a particular crime.'" Smith v. State, 866 So.2d 51, 71 (Fla.2004) (Pariente, J., concurring in part and dissenting in part) (quoting Jackson v. State, 451 So.2d 458, 461 (Fla.1984)). Here, the trial judge admitted evidence of collateral crimes without first determining that Durousseau committed those crimes. The danger is that the jury convicted Durousseau because it heard evidence of multiple similar crimes of which he was accused and not because the evidence proved that he committed any of them, let alone the charged crime beyond a reasonable doubt. Therefore, it is absolutely essential that the trial judgeand this Courtcarefully examine the evidence of Durousseau's guilt as to each prior crime before concluding that it can be used as evidence in this case.
In the present case, there is not clear and convincing evidence established in this record that Durousseau committed one of the collateral crimesthe Kilpatrick murderwithout reliance on the similarities between the collateral crimes and the charged crime. The evidence linking Durousseau to the murder of Kilpatrick in late December 2002, without reference to the other murders, is the following: Durousseau met Kilpatrick in the fall of 2002; he had sex with Kilpatrick shortly before her death (DNA matching Durousseau at eight of thirteen loci was found inside her); he was in the vicinity of her apartment complex between the time she was last seen alive and the time her body was founda span of two to three days; and he denied knowing her when questioned by the police. There is no other evidence connecting him to her murderfor example, his DNA was not found on the cord *567 used to strangle her. This falls short of the clear and convincing quantum of proof needed to admit the evidence of this collateral crime. Clear and convincing evidence requires more than proof that Durousseau had the opportunity to commit the murder or mere suspicion that he committed the murder. See State v. Norris, 168 So.2d 541, 543 (Fla.1964) ("[M]ere suspicion is insufficient. The proof should be clear and convincing."). Accordingly, the admission of this collateral crime evidence was in error.
On the other hand, I conclude that there is clear and convincing evidence, independent of the similarities between the collateral crimes and the charged crime, that Durousseau committed the McCallister murder, including evidence that was introduced at trial. Durousseau was identified as being at the crime scene during the small window of time in which McCallister was murdered; Durousseau was identified as hastily leaving the scene; his DNA was found on a condom at the crime scene; he made an anonymous 911 call the next day that gave details about the crime scene; and he denied knowing McCallister (other than having picked her up as a cab fare) when questioned by the police. At trial, Durousseau provided a version of the events that pointed toward McCallister's boyfriendthe person who found McCallister's body and alerted neighborsas being the murderer. However, Durousseau's testimony contradicted that of other witnesses.
Because the testimony regarding all three murders was heard by the jury, I cannot say that the erroneous admission of the collateral crime evidence of the Kilpatrick murder did not affect the verdict. Even the State conceded at oral argument that an argument for harmless error would be a "tough argument" to make. "This Court has held that the erroneous admission of irrelevant collateral crimes evidence `is presumed harmful error because of the danger that a jury will take the bad character or propensity to crime thus demonstrated as evidence of guilt of the crime charged.'" Robertson, 829 So.2d at 913-14 (quoting Castro v. State, 547 So.2d 111, 115 (Fla.1989)). In this case, the Kilpatrick murder was critical to the State's argument that it could not just be coincidence that Durousseau had sex with three women shortly before they were murdered. In closing argument, the State stressed the similarities between the crimes and argued: "What are the chances that he could have sex with three women, they all show up dead, and the deaths are all similar, the scenes are all similar, and the conduct is all similar?" Therefore, I conclude that the erroneous admission of the Kilpatrick murder evidence undeniably affected the verdict.
For all these reasons, I respectfully dissent.
QUINCE, J., concurs.
NOTES
[1] Williams v. State, 110 So.2d 654 (Fla.1959).
[2] Spencer v. State, 615 So.2d 688 (Fla.1993).
[3] The trial court found each of the following four aggravators on which it instructed the jury: (1) the murder was especially heinous, atrocious, or cruel (great weight), (2) the crime was committed while the defendant was engaged in a robbery and sexual battery (great weight), (3) the murder was committed for pecuniary gain (little to moderate weight), and (4) the defendant was previously convicted of a felony involving the use or threat of violence to the person (moderate to significant weight).
[4] In rejecting the requested statutory mitigators, the trial court also rejected the defense expert's conclusions in support of the statutory mitigation that Durousseau displayed symptoms of bipolar mood disorder and schizoaffective disorder.
[5] The trial court found that the following sixteen nonstatutory mitigators were proven: (1) the defendant was raised in a broken home (little weight); (2) the defendant was raised without the benefit of his natural father and lost the love and support of his stepfather at an early age (little weight); (3) the defendant grew up in poverty and came from a deprived background (little weight); (4) the defendant was raised in a violent neighborhood and was exposed to violence and the threat of violence to his person on a daily basis (little weight); (5) the defendant personally witnessed his stepfather physically abuse his mother (moderate weight); (6) the defendant was beaten as a means of discipline as a child (little weight); (7) the defendant worked continuously through his adult life (little to moderate weight); (8) the defendant enlisted and served in the United States Army for approximately six years (moderate weight); (9) the defendant has supported his two children and is a loving and caring father (little weight); (10) the defendant has been a loving, respectful son to his mother and cared for her during several periods of illness and incapacitation (moderate weight); (11) the defendant has been a good brother to his siblings and to other family members, helping to care for and watch over his cousins (moderate to significant weight); (12) the defendant saved his cousin's life and his brother's life (moderate weight); (13) the defendant has the support of family and friends who continue to love him (little weight); (14) the defendant has alcohol abuse issues on both his mother's and father's sides of his family; despite this, Durousseau, himself, has never abused alcohol or illicit drugs (very little weight); (15) society can be protected by a life sentence without parole (very little weight); (16) the defendant has exhibited good behavior during the trial of this cause (little weight).
[6] Federal caselaw employs an even lesser burden for the admission of collateral crime evidence. The trial court, in a criminal case, is not required to weigh credibility or make a finding that the government has proved the conditional fact. Rather, the court examines all of the evidence and decides whether the jury could reasonably find by a preponderance of the evidence that the defendant committed the crime in question. See e.g., Dowling v. United States, 493 U.S. 342, 356, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990) (citing Huddleston v. United States, 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988)).
[7] Mack was twenty-four years old and had short, curly black hair, was five feet four inches tall and 122 pounds. Kilpatrick was twenty years old, had short, curly black hair, was five feet five inches tall and weighed 145 pounds. McCallister was twenty years old, had short, curly black hair, was five feet five inches tall and weighed 161 pounds.
[8] Mack was not pregnant and lived with her three young children. Kilpatrick was pregnant and lived with her two young children. McCallister was pregnant.
[9] Mack suffered from abrasions to her face. The medical examiner opined that such abrasions were consistent with her face moving back and forth across a towel that was found beneath her head. Kilpatrick suffered from blunt force trauma to the head.
[10] Although several serologists presented testimony, only one testified regarding the victims. The other serologists presented evidence regarding the defendant's DNA.
[11] Although Durousseau initially denied having any relationship with or knowledge of Mack when questioned by police, he later testified that he had visited Mack at her home on the day of the murder. He claimed that he engaged in sexual intercourse with Mack, purchased the television from Mack because she said it was broken and no longer wanted it, and then left while Mack was still alive. Durousseau claimed that Mack came downstairs with him when he placed the television in his car. However, neither witness saw a woman with him at that time.