# Supreme Court of Florida

_____

No. SC18-822
_____

**DONALD JAMES SMITH,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

April 22, 2021

PER CURIAM.

Donald James Smith appeals his judgment of conviction and sentence of death. We have jurisdiction. _See_ art. V, § 3(b)(1), Fla. Const. We affirm.

**I**

On June 21, 2013, Smith met eight-year-old Cherish Perrywinkle, her sisters, and her mother, Rayne, at a Dollar General store in Jacksonville. Smith overheard Rayne explain to an employee that she could not afford to purchase a dress for Cherish, and offered to drive the Perrywinkles to Walmart and buy clothes

for the family. Smith explained to Rayne that his wife had a gift card and would meet the group there. At Walmart, they shopped together for hours. It got late and the Perrywinkles had not eaten, so Smith said he would buy them all cheeseburgers at a McDonalds inside the store. Instead, at 10:44 p.m., he vanished with Cherish. Surveillance cameras caught Smith leading her to his van, as well as the two of them driving away.

Cherish was not seen alive again. The next morning, with the help of witnesses reporting the location of Smith's van, police located Cherish's body in a creek behind a church, under a pile of debris. Cherish had been brutally raped, then strangled to death. An officer identified Smith, who was soaking wet, behind the wheel of the same van that had left Walmart. It contained the things Rayne had bought at Dollar General. Smith was arrested and charged with kidnapping, sexual battery of a person under twelve, and first-degree murder.

News outlets in Florida and the United States covered the murder extensively. In Jacksonville, live broadcasts highlighted Smith's prior sex crime convictions in 1977, 1992, and 2009. Outlets in Panama City, Tallahassee, Orlando, Tampa, and Miami

reported on the murder. Even CNN and Fox News picked up the story. City news stations dedicated webpages to the case and many blogs and social media posts discussed the murder.

Media outlets also covered the effect of the murder on the local community, and the community's outreach to Rayne. Hundreds of people attended Cherish's funeral, which was locally televised. Eighteen to nineteen hundred people reportedly signed the guest book at Cherish's viewing. Families that had never met the Perrywinkles stopped by their home with groceries.

Smith's case progressed to trial, and in 2015, Smith's defense team filed a motion to change venue. They argued that widespread media coverage had painted Smith as a monster who should be executed, a sexual predator who was guilty beyond doubt. Smith maintained that the media had adopted the State's theory of the case, and that the State's themes persisted on social media two years after Cherish's death. The trial court held a hearing on the motion for change of venue, but reserved ruling until after jury selection. In light of the extensive pretrial publicity, the trial court used a written juror questionnaire and individual voir dire regarding exposure to press coverage as part of the jury selection

process. The questionnaire asked about jurors' knowledge of the case and witnesses, and about any opinions they had formed about the case and the death penalty. Three hundred potential jurors completed these questionnaires. The court ultimately empaneled the jury without an objection from defense counsel or a request for a final ruling on its motion to change venue.

Before trial began, Smith also filed a motion in limine to prevent the State from offering autopsy photos of the victim. Counsel argued that because Dr. Valerie Rao, the chief medical examiner for Duval County and a trained pathologist, was to testify to Cherish's injuries, there was no need to introduce photographs of those injuries. Smith's team argued that the pictures' unduly prejudicial emotional effect would outweigh their probative value. The trial court denied Smith's motion.

In the State's opening statement at trial, the prosecutor described what took place at Walmart and stated, "Every mother's darkest nightmare became Rayne Perrywinkle's reality." Smith objected to the comment on the grounds that it was argumentative, and the court overruled the objection.

Later in the proceedings, the State called Dr. Rao to testify to the extent of Cherish's injuries. Dr. Rao explained that she had testified in hundreds of cases as an expert witness, providing her opinion on various potential causes of death. Dr. Rao had performed Cherish's autopsy and had been present at the creek when her body was recovered. As Dr. Rao testified, the State introduced twenty-six pictures of Cherish's autopsy into evidence. Dr. Rao described injuries on Cherish's scalp, chest, legs, arm, neck, chin, lip, nose, eyes, genitals, and throat. When the prosecutor asked Dr. Rao about Cherish's throat, Dr. Rao stammered slightly, and the following exchange occurred:

> Prosecutor: I'm going to show you two more photographs of the dissection taken of Cherish Perrywinkle's throat. Will you first tell the jury what you saw when you dissected her throat?
>
> Dr. Rao: Yes. So what we do is – I'm sorry. I just need a break. Have [sic] about five minutes.
>
> Court: You want a five-minute break? I think we'll all take a break for ten minutes. Thank you.

The judge dismissed the jury and defense counsel moved for a mistrial, arguing that Dr. Rao's response was so prejudicial that it could not be cured by any jury instruction. The court denied the

motion. After the ten-minute recess, Dr. Rao resumed her testimony without further interruption. The State later called a crime laboratory analyst, who testified that Smith's DNA was found on and inside Cherish's body. He put the odds at one in 35 quintillion that the DNA belonged to someone else. The State also produced surveillance footage of Smith leading Cherish from Walmart to his van.

During closing argument, the State at one point stated, "And from the grave she's crying out to you, [']Donald Smith raped me. Donald Smith sodomized me. Donald Smith strangled me until every last breath left my body.[']" Counsel for Smith did not object to this statement, and indeed presented no closing argument.

The jury deliberated for nineteen minutes before unanimously finding Smith guilty of kidnapping, sexual battery of a person under twelve years old, and first-degree murder. By special verdict, the jury convicted Smith of both premeditated and felony murder with kidnapping and sexual battery as the underlying felonies.

At the penalty phase of trial, Smith presented nine witnesses, including a psychologist, a neurologist, and his son. The State presented one witness, the victim of a 1992 attempted kidnapping

by Smith.  Following these presentations, the jury unanimously recommended that Smith be sentenced to death.[1]  After conducting a *Spencer* hearing,[2] the trial court entered a sentencing order accepting the jury's recommendation and imposing the death penalty.

## II

On appeal, Smith raises the following five claims: (a) the trial court abused its discretion in denying Smith's motion for change of venue; (b) the trial court abused its discretion in denying Smith's motion for mistrial during the medical examiner's testimony; (c) the trial court abused its discretion by denying Smith's motion to exclude autopsy photos; (d) the trial court abused its discretion by

---

1.  The jury unanimously found six aggravating factors: (1) the defendant was previously convicted of a felony involving the use or threat of violence to the person; (2) the defendant was engaged in a kidnapping and sexual battery during the capital felony; (3) the capital felony was committed for the purpose of avoiding or preventing a lawful arrest; (4) the capital felony was especially heinous, atrocious, or cruel; (5) the capital felony was a homicide and was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification; and (6) the victim of the capital felony was a person less than twelve years of age. *See* § 921.141(b), (d)-(e), (h)-(i), and (l), Fla. Stat. (2017).

2.  *Spencer v. State*, 615 So. 2d 688 (Fla. 1993).

overruling an objection to the prosecutor's opening statement and committed fundamental error by not granting a mistrial during the prosecutor's closing statement; and (e) the cumulative effect of the errors in the case deprived Smith of a fair trial. We address each claim in turn.

**A**

Smith argues that the trial court erroneously denied his motion for change of venue. "[A] defendant may move for a change of venue on the ground that a fair and impartial trial cannot be had in the county where the case is pending for any reason other than the interest and prejudice of the trial judge." Fla. R. Crim. P. 3.240(a). A trial court should grant a change of venue if "the . . . state of mind of the inhabitants of a community is so infected by knowledge of the incident and accompanying prejudice, bias, and preconceived opinions that jurors could not possibly put these matters out of their minds and try the case solely on the evidence presented in the courtroom." *Manning v. State*, 378 So. 2d 274, 276 (Fla. 1979).

Generally, we review a trial court's ruling on such a motion for abuse of discretion. However, as is the case with most trial

objections, an objection to the trial court's denial of a motion for a change of venue must be preserved for appellate review. That is, "the issue or legal argument must be raised *and* ruled on by the trial court." *Rhodes v. State*, 986 So. 2d 501, 513 (Fla. 2008). If an issue is not preserved, it is reviewed only for fundamental error. Such an error "reach[es] down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." *Knight v. State*, 286 So. 3d 147, 151 (Fla. 2019) (quoting *Brown v. State*, 124 So. 2d 481, 484 (Fla. 1960)). Defendants have no constitutional due process right to correct an unpreserved error, and appellate courts should "exercise . . . discretion under the doctrine of fundamental error very guardedly." *Sanford v. Rubin*, 237 So. 2d 134, 137 (Fla. 1970).

The trial court never ruled upon Smith's motion for change of venue and Smith did not renew his objection, thus the issue was not preserved for appellate review. Smith made the motion in 2015, three years before trial commenced, and the court reserved ruling on the motion until after the parties attempted to seat a jury in Duval County. In 2018, at the beginning of jury selection, counsel renewed Smith's motion for change of venue, but the court again

- 9 -

deferred a ruling. At the end of jury selection, counsel stated that they had no further objections. When the jury was sworn at the beginning of trial, Smith's team did not renew the objection or request a final ruling on the motion for change of venue. Because there was no ruling on the motion, the issue was not preserved and the trial court's failure to grant Smith's motion is reviewed for fundamental error. *Rhodes*, 986 So. 2d at 513; *see also Jones v. State*, 998 So. 2d 573 (Fla. 2008) (finding appellant's *Brady* [*v. Maryland*, 373 U.S. 83 (1963)] claim was not preserved because it was not ruled on by the trial court).

The trial court committed no fundamental error in failing to grant Smith's motion for change of venue. *See e.g., Armstrong v. State*, 862 So. 2d 705, 719 (Fla. 2003) (finding a trial court committed no fundamental error when it denied a motion for change of venue where jurors explained they could set aside pretrial knowledge and feelings about victims). Courts correct errors as fundamental despite a party's failure to conform to procedural rules regarding preservation "to protect the interests of justice itself." *Maddox v. State*, 760 So. 2d 89, 98 (Fla. 2000). For example, this Court has found fundamental error when appellants were denied

- 10 -

the right to counsel. *Jackson v. State*, 983 So. 2d 562, 566 (Fla. 2008) ("While a denial of counsel for an entire sentencing proceeding would constitute fundamental error, the temporary absence of counsel [during a victim impact statement] does not."); *see also Gonzalez v. State*, 838 So. 2d 1242, 1243 (Fla. 1st DCA 2003) (vacating an indigent appellant's sentence and remanding for further resentencing after appellant was denied counsel). We have also found fundamental error when a court provided an inaccurate definition of a disputed element of a crime in a jury instruction. *Reed v. State*, 837 So. 2d 366, 369 (Fla. 2002) (quashing a district court's decision after the court provided a definition of "maliciously" in conflict with a previous Florida Supreme Court decision). Similarly, we found fundamental error when evaluating "a conviction imposed upon a crime totally unsupported by evidence." *Troedel v. State*, 462 So. 2d 392, 399 (Fla. 1984); *see also F.B. v. State*, 852 So. 2d 226, 230 (Fla. 2003) ("[A]n argument that the evidence is totally insufficient as a matter of law to establish the commission of a crime need not be preserved. Such complete failure of the evidence meets the requirements of fundamental error . . . .").

Unlike the cases above, here, the interests of justice were not jeopardized by counsel's failure to obtain a ruling on Smith's motion for change of venue. Smith has advanced no specific allegations of prejudice, and there is no evidence that the media exposure actually tainted Smith's trial. In capital cases, a fundamental error is one that is "so significant that the sentence of death 'could not have been obtained without the assistance of the alleged error.'" *Poole v. State*, 151 So. 3d 402, 415 (Fla. 2014) (quoting *Snelgrove v. State*, 107 So. 3d 242, 257 (Fla. 2012)). Here, we find no basis upon which to make that conclusion. For one thing, the evidence of guilt is overwhelming. The jury in this case saw Cherish's autopsy photos, learned that Smith's DNA was on and in Cherish's body, watched surveillance footage of Smith leading Cherish to his car, heard witness testimony about his van's location, and listened to Rayne Perrywinkle's 911 call. A jury anywhere in the state would have given great weight to this evidence.

What is more, the court would not have abused its discretion had it denied the motion. In exercising discretion regarding a change of venue, "a trial court must make a two-pronged analysis, evaluating: (1) the extent and nature of any pretrial publicity; and

(2) the difficulty encountered in actually selecting a jury." *Griffin v. State*, 866 So. 2d 1, 12 (Fla. 2003). This Court has previously explained that "pretrial publicity is normal and expected in certain kinds of cases, and that fact standing alone will not require a change of venue." *Id.* There are five factors to be considered when evaluating pretrial publicity: (1) when the publicity occurred in relation to the crime and the trial, (2) whether the publicity was made up of factual or inflammatory stories, (3) whether the publicity favored the State's side of the story, (4) the size of the community exposed to the publicity, and (5) whether the defendant exhausted all of his peremptory challenges in seating the jury. *Rolling v. State*, 695 So. 2d 278, 285 (Fla. 1997).

Here, on balance, the *Rolling* factors weigh in the State's favor. Much of the pretrial publicity in this matter occurred five years before jury selection—in 2013, right after Cherish Periwinkle was murdered. The court administered a jury questionnaire to screen potential jurors for concerns arising from exposure to media reports. Four of the jurors ultimately chosen for Smith's trial had not heard of the case at all. Seven jurors had seen some coverage in years past but had minimal knowledge of the case. One juror

- 13 -

testified that she knew about Smith and the victims, but knew nothing of their pasts, and could serve on the jury impartially because she saw Smith as a human being. Thus, notwithstanding substantial and negative media coverage about Smith and the facts of the case, the size and diversity of the community from which the venire was drawn, the long delay between the initial publicity and trial, and the fact that Smith sought no additional peremptory challenges all weigh in favor of concluding that the trial court would not have abused its discretion had it denied the motion to change venue. *See Rolling*, 695 So. 2d at 287 (denying motion for change of venue in Gainesville after a defendant murdered five students despite overwhelming media attention and the fact that "every member of the venire had some extrinsic knowledge of the facts and circumstances surrounding this case.").

## B

Next, Smith argues that the trial court erred in denying his motion for a mistrial on account of the interruption to Dr. Rao's testimony. While testifying to the injuries that Cherish sustained, Dr. Rao paused, took a breath, and asked to take a break. The trial court promptly recessed. Smith contends that this pause was

tantamount to a breakdown and asserted the only way to cure the disruption was to declare a mistrial. We disagree.

We review the denial of a motion for mistrial for abuse of discretion, and "[a] mistrial is appropriate only where the error is so prejudicial as to vitiate the entire trial." *Hamilton v. State*, 703 So. 2d 1038, 1041 (Fla. 1997). When reviewing a motion for a mistrial dealing with emotional outbursts from witnesses, "appellate courts should defer to trial judges' judgments and rulings when they cannot glean from the record how intense a witness's outburst was." *Thomas v. State*, 748 So. 2d 970, 980 (Fla. 1999) (finding no abuse of discretion in failing to grant a mistrial after a friend of the victim suffered an emotional breakdown when asked to identify an accused while testifying in front of a jury).

The fact that Dr. Rao took a break during her testimony did not affect the fairness of Smith's trial. The jury saw no outburst of emotion. From its vantage point, which was closer to Dr. Rao's reaction than ours, the trial court determined that a recess was appropriate, and a mistrial was not. *See Thomas*, 748 So. 2d at 980. We cannot say this was an abuse of discretion.

This case is not like the one cited by Smith, where a witness's outburst injected into the proceedings a concern for the emotional distress of another sufficient to distract the jury from its work as finders of fact.  *See Colon v. State*, 191 So. 3d 985, 986 (Fla. 2d DCA 2016) (reversing a trial court's denial of motion for mistrial after a witness-mother cried and threw up when photographs of her dead child's genitals were introduced through her testimony).  Here, Dr. Rao paused, caught her breath, and asked for a break.  She did not state why she was requesting a break, and when testimony resumed, Dr. Rao spoke clearly and did not appear to the jury to be in any emotional distress.

Smith objects that the trial court should have given a curative instruction after Dr. Rao asked to pause.  The response to a witness outburst is also "better left to the discretion of trial judges who are in the best position to assess the intensity of the outburst and its potential effect on jurors."  *Talley v. State*, 260 So. 3d 562, 569 n.4 (Fla. 3d DCA 2019) (declining a defendant's suggestion to adopt a new standard requiring trial courts to poll a jury whenever there is an outburst during trial proceedings); *see also Arbelaez v. State*, 626 So. 2d 169, 176 (Fla. 1993) (affirming a trial court's use of a

curative instruction after a witness-mother, crying as she took the witness stand, cursed the defendant). Here, we cannot say the trial court abused its discretion in declining to give such an instruction.

**C**

Smith argues next that the trial court improperly denied his motion to exclude autopsy photographs used during Dr. Rao's testimony. Smith's motion argued that admitting these photographs would violate section 90.403, Florida Statutes (2017) ("Relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence."). The State ultimately introduced twenty-six photos of Cherish's various injuries, including pictures of her exposed skull and trachea.

We evaluate rulings about the admissibility of evidence for abuse of discretion, and "[t]his Court has long followed the rule that photographs are admissible if they are relevant and not so shocking in nature as to defeat the value of their relevance." *Czubak v. State*, 570 So. 2d 925, 928 (Fla. 1990). A court "must determine whether the gruesomeness of the portrayal is so inflammatory as to create

an undue prejudice in the minds of the jury and [distract] them from a fair and unimpassioned consideration of the evidence." *Id.* (alteration in original) (quoting *Leach v. State*, 132 So. 2d 329, 332 (Fla. 1961)).

This Court has "consistently upheld the admission of allegedly gruesome photographs where they were independently relevant or corroborative of other evidence." *Id.* at 928; *see also Seibert v. State*, 64 So. 3d 67 (Fla. 2010) (upholding admission of photographs of victim's dismembered body to show premeditation and consciousness of guilt); *Jackson v. State*, 545 So. 2d 260 (Fla. 1989) (upholding admission of photographs of victims' charred remains to prove identity, show circumstances surrounding murder, and corroborate medical examiner's testimony); *Bush v. State*, 461 So. 2d 936 (Fla. 1984) (ruling photographs of blowup of bloody gunshot wound to victim's face admissible to corroborate medical examiner's testimony); *Straight v. State*, 397 So. 2d 903 (Fla. 1981) (holding photograph of victim's decomposed body admissible to corroborate testimony as to how death was inflicted).

Smith has argued that there was no need to publish the autopsy photographs given the overwhelming evidence already

present in the case linking him to the victim, but "[t]he test for admissibility of photographic evidence is relevancy rather than necessity." *Pope v. State*, 679 So. 2d 710, 713 (Fla. 1996); *see also Campbell v. State*, 271 So. 3d 914, 934 (Fla. 2018) ("There is no question that [the exhibit] is graphic, depicting a significant chopping wound to the brain. However, the photograph was relevant to illustrate the nature and extent of the victim's injuries, as well as the medical examiner's testimony."); *see also Patrick v. State*, 104 So. 3d 1046, 1062 (Fla. 2012) ("[P]hotographs . . . depict[ing] the skin of the victim's head pulled back to reveal his skull and the entire torso opened to reveal his upper chest . . . were provided to demonstrate the internal injuries sustained since they were not otherwise visible.").

Cherish's autopsy photos were relevant to the brutality of her rape and the premeditation of her murder, as well as the heinous, atrocious, and cruel nature of the crime. For example, as the State argued, a picture showing the manner in which the skin had been stripped from Cherish's throat was relevant evidence that the cause of her death had been strangulation. While not on its own sufficient to establish premeditation, "evidence of strangulation, in

conjunction with one or more additional facts indicating that the killer had time to reflect upon his actions and to form a conscious purpose to kill, justifies submitting the question of premeditation to the jury for its determination." *Berube v. State*, 5 So. 3d 734, 744 (Fla. 2d DCA 2009); *see also Wainwright v. State*, 2 So. 3d 948, 952 (Fla. 2008) ("The trial court did not err in concluding that evidence of strangulation alone may be sufficient to support the HAC aggravator. '[T]his court has consistently upheld the HAC aggravator in cases where a conscious[3] victim was strangled.'") (quoting *Bowles v. State*, 804 So. 2d 1173, 1178 (Fla. 2001)); *Barnhill v. State*, 834 So. 2d 836, 850 (Fla. 2002) ("Because strangulation of a conscious victim involves foreknowledge and the extreme anxiety of impending death, death by strangulation constitutes prima facie evidence of HAC.").

Context matters in evaluating a trial court's exercise of discretion in evidentiary rulings. While, absent such context, the photographs at issue in this case seem numerous, the reality is that most of the photos identified separate injuries on Cherish's body.

---

3. Dr. Rao testified that evidence of a struggle showed Cherish was conscious when Smith strangled her.

There were multiple photographs of Cherish's genitals and throat, but these pictures were necessary to demonstrate the extent of the damage done to her body during the sexual battery and to support the medical examiner's explanation of the time period and force required to strangle her to death. Each photograph was relevant to the brutality of Cherish's death, and the brutality of the crime, in turn, was relevant to support the State's legal charge: a murder that was both premediated and heinous, atrocious, and cruel.

**D**

Next, Smith argues that the State made inappropriate comments in its opening statement and in closing argument. Smith objected to the prosecutor's opening statement ("[e]very mother's darkest nightmare became Rayne Perrywinkle's reality"), so we review the trial court's overruling the objection for abuse of discretion. *Merck v. State*, 975 So. 2d 1054, 1061 (Fla. 2007). Smith did not object to the prosecutor's closing statement ("from the grave she's crying out to you, Donald Smith raped me"), so we review this statement for fundamental error. *State v. Smith*, 241 So. 3d 53, 55 (Fla. 2018).

First, the trial court did not abuse its discretion in overruling Smith's objection to the statement at issue in the State's opening. The purpose of an opening statement is for parties to convey to the jury what they expect the evidence produced at trial to establish. *Perez v. State*, 919 So. 2d 347, 363 (Fla. 2005). In Florida, the trial court gives parties "wide latitude" in presenting opening and closing statements, and "comments by the prosecutor will merit a mistrial only when they deprive the defendant of a fair and impartial trial, materially contribute to the conviction, are so harmful or fundamentally tainted as to require a new trial, or are so inflammatory they might have influenced the jury to reach a more severe verdict than it would have otherwise rendered." *Miller v. State*, 161 So. 3d 354, 382 (Fla. 2015) (citing *Spencer v. State*, 645 So. 2d 377, 383 (Fla. 1994). Here, Smith claims that the prosecutors' comments amounted to improper "golden rule" arguments, which impermissibly persuade jurors to "place themselves in the victim's position during the crime and imagine the victim's suffering." *Mosley v. State*, 46 So. 3d 510, 520 (Fla. 2009).

The State's opening comment was dramatic, but not untrue; nor was it a mischaracterization of the evidence that would soon be presented to the jury. At trial, the State may make comments that "are based on evidence introduced at trial and are relevant to the circumstances of [the crime]." *Braddy v. State*, 111 So. 3d 810, 843 (Fla. 2012) (alteration in original) (quoting *Mosley*, 46 So. 3d at 521). When the prosecutor made the statement at issue, she knew that Rayne Perrywinkle was slated to testify and that Rayne's testimony and 911 call recording would attest to the terror she felt when she realized Cherish was missing. Here, the State was not making an impermissibly inflammatory statement; rather, the prosecutor was previewing what Rayne herself would soon explain.[4]

In *Reese v. State*, 694 So. 2d 678, 685 (Fla. 1997), this Court found no error where a prosecutor made similar comments during closing argument describing a victim's rape and murder as "every woman's worst nightmare." *Reese v. Sec'y Fla., Dept of Corr.*, 675 F. 3d 1277, 1292 (11th Cir. 2012). Nor did the Eleventh Circuit find

---

4. In her testimony, Rayne explained that she "started to panic," and her 911 call documented her asking, "Why on earth would he take my little girl?"

- 23 -

any part of that closing argument to be a due process violation. *Id.* at 1278-88. The court explained that no golden rule violation had occurred because "the prosecutor did not impermissibly invite 'the jury to place themselves in the victim's shoes.'" *Id.* at 1292 (quoting *Reese,* 694 So. 2d at 685 (Fla. 1997). Like the comment in *Reese,* here, the State's opening comment was a reasonable projection of what the evidence would show to be Rayne Perrywinkle's state of mind when she found out her daughter was missing.

Second, the trial court did not commit fundamental error when it allowed the State's comment during summation to which Smith objects. Summation is intended to review evidence and draw inferences, but, like opening statement, "must not be used to inflame the minds and passions of the jurors so that their verdict reflects an emotional response to the crime or the defendant rather than the logical analysis of the evidence in light of the applicable law." *Bertolotti v. State,* 476 So. 2d 130, 134 (Fla. 1985). Comments that "invit[e] the jury to imagine the victim's final pain, terror and defenselessness" are prohibited. *Id.* at 133. Yet a prosecutor's words may, indeed sometimes must, elicit an emotional response from the jury. That fact of life, particularly in

- 24 -

matters of life and death, is not a basis for reversal. Here, by the

time of closing argument, the State had put forth evidence that

Smith raped and sodomized Cherish, and that he strangled her to

death. The prosecutor's comments did more purposefully to elicit

an emotional reaction than is advisable, but they were moving in

substantial measure because of how they characterized the

disturbing facts in evidence. *See Rogers v. State*, 957 So. 2d 538,

549 (Fla. 2007) (holding that State's comments describing victim's

murder and last moments alive were not improper because they

were based upon facts in evidence); *see also Mosley*, 46 So. 3d at

520 (holding that State's comments describing victim trying to

breathe as she was being suffocated and noting victim's opportunity

to contemplate death were not improper because comments were

based on facts in evidence).[5] Smith had an opportunity to rebut the

---

5. In *Darden v. Wainwright,* 477 U.S. 168, 181 (1986), the Supreme Court relied on six factors in evaluating a due process claim arising from a prosecutor's inappropriate comments: (1) whether the prosecutor manipulated or misstated the evidence, (2) whether the comments implicated other specific rights of the accused, (3) whether the comments were invited by or responsive to defense counsel's arguments, (4) whether the trial court's instructions ameliorated the harm, (5) whether the evidence weighed heavily against the defendant, and (6) whether the defendant had an opportunity to rebut the prosecutor's comments.

prosecutor's comments in closing argument, but waived closing statement instead. *See Darden*, 477 U.S. at 181.

**E**

In the final point on appeal, Smith argues that the cumulative effect of the errors in this case deprived him of a fair trial. Where multiple errors are discovered, it is appropriate to review the cumulative effect of those errors because even with competent, substantial evidence to support a verdict, "and even though each of the alleged errors, standing alone, could be considered harmless, the cumulative effect of such errors [may be] such as to deny to defendant the fair and impartial trial that is the inalienable right of all litigants in this state and this nation." *McDuffie v. State*, 970 So. 2d 312, 328 (Fla. 2007) (alteration in original) (quoting *Brooks v. State*, 918 So. 2d 181, 202 (Fla. 2005)). But relief is not warranted if there is "no reasonable probability that the cumulative effect of these errors affected [a defendant's] right to a fair trial." *Floyd v.*

---

The comments at issue here did not manipulate or misstate the evidence, implicated no specific rights of the accused, and while they were neither invited by the accused nor the subject of an instruction from the court, were insignificant when compared to the weight of the evidence, and drew no response from the defendant.

*State*, 850 So. 2d 383, 408 (Fla. 2002). And where we find "no individual error, no cumulative error can exist." *Smith v. State*, 998 So. 2d 516, 530 (Fla. 2008); *see also Bush v. State*, 295 So. 3d 179, 214 (Fla. 2020) (finding an appellant entitled to no relief on his cumulative error claim when each of his individual claims of error was meritless).

That is the case here. Smith's DNA was found in and on Cherish's body, he was caught on several different surveillance cameras leading Cherish to his car, multiple witnesses spotted his van by the water in which Cherish's body was found, and his pants were soaking wet as he was arrested. It is the evidence in this case, not error, that is cumulative.

**CONCLUSION**

We affirm Smith's judgment of conviction and sentence of death.

It is so ordered.

CANADY, C.J., and POLSTON, LAWSON, COURIEL, and GROSSHANS, JJ., concur.
LABARGA, J., concurs in result with an opinion.
MUÑIZ, J., recused.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

LABARGA, J., concurring in result.

In light of this Court's decision in *Lawrence v. State*, 308 So. 3d 544 (Fla. 2020) (receding from proportionality review requirement in death penalty direct appeal cases), and for the reasons expressed in my dissent in *Lawrence, id.* at 552-58, I can only concur in the result.

An Appeal from the Circuit Court in and for Duval County,
    Mallory Durden Cooper, Judge – 162013CF005781AXXXMA

H. Kate Bedell and Richard Randall Kuritz of Law Offices of Bedell & Kuritz, Jacksonville, Florida,

    for Appellant

Ashley Moody, Attorney General, and Charmaine M. Millsaps, Senior Assistant Attorney General, Tallahassee, Florida,

    for Appellee